**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**

| | | |
|---|---|---|
| Matt Schweder, individually and as<br>Father and Guardian of P.S, and | ) | |
| | ) | |
| Larry Nichols,<br>Joshua Nichols, and | ) | |
| | ) | |
| Wesley Anglin,<br>Frank Anglin and Maggie Anglin, and | ) | |
| | ) | |
| Robin Harbolt, individually and as<br>Guardian of P.H., and | ) | |
| | ) | |
| Charles w. (Jeep) Burton, and | ) | ) |
| | ) | |
| Kenneth L. Kearns II, and | ) | |
| | ) | |
| JANE AND JOHN DOES 1-100, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| vs. | ) | **COMPLAINT** |
| | ) | |
| GOVERNOR ANDREW GRAHAM BESHEAR<br>in his official and personal capacities, and | ) | **Jury Trial Demanded** |
| | ) | |
| | ) | Civil Action No. |
| KENTUCKY DEPARTMENT OF PUBLIC<br>HEALTH COMMISSIONER<br>STEVEN J. STACK, in his official and<br>personal capacities, and | ) | |
| | ) | |
| CABINET FOR HEALTH AND FAMILY<br>SERVICES SECRETARY<br>ERIC C. FRIEDLANDER in his official<br>And personal capacities, and | ) | |
| | ) | |
| JANE AND JOHN DOES 1-20, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## **TABLE OF CONTENTS**

**I.  SUMMARY OF THE CASE**................................................................4

**II.  STANDING, VENUE, JURISDICTION**.................................................17

**III.  THE PLAINTIFFS**..............................................................................19

**IV.  THE DEFENDANTS**........................................................................35

**V.  STATEMENT OF FACTS**..................................................................35

     **A.**      **Chronology**.......................................................................35

     **B.**      **There is No Emergency - Even Assuming the Accuracy of COVID-19 "Death" and "Case" Counts**....................................51

          (1)     Reported COVID-19 Deaths Fall Far Below the Deaths Projected a Year Ago

          (2)     COVID-19 Does Not Threaten the Entire Population - Fatalities Are Limited to a Definable Age Demographic

          (3)     COVID-19 Kills Fewer People than other Causes of Death, for Which No Emergency Has Been or Will Be Declared

          (4)     COVID-19 Has Not Overwhelmed Healthcare Capacity

          (5)     Multiple COVID-19 Vaccines are Now Deployed

          (6)     The Population Has Reached or Is Fast Approaching Herd Immunity

     **C.**      **There is No Emergency - the COVID-19 "Death" and "Case" Counts are Inflated**.........................................................57

          (1)     New NVSS Coding Instructions Unique to the Death Certificates of Individuals Testing Positive for COVID-19 Result in the Over-Reporting of Deaths Caused by COVID-19

          (2)     The PCR Test for COVID-19 is Seriously Flawed and Results in False Positive Results at High Cycles

          (3)     Maine CDC's "Case" Count is Inflated by Inclusion of "Probable Cases" and Cases of Persons not Living in Maine

          (4)     The "Case" Count is Subject to Perverse Financial Incentives

     **D.**      **The Defendants' COVID-19 Mandates Are Ineffectual, and Unsupported by Science or Medicine**.................................70

(1)     The Fallacy of Asymptomatic Spread
(2)     The Futility of Masking
(3)     The Futility of Lockdowns

**E.     The Defendants' COVID-19 Mandates Have Wrought More Harm than COVID-19 Itself Has Caused** .................................79

(1)     The Economic Crisis Caused by the Emergency Mandates
(2)     The Human Catastrophe Caused by the Emergency Mandates

**VI.  COUNTS** .......................................................................................83

**Count I:       Declaratory Judgment – Cessation of Emergency** ...............93

**Count II:      Declaratory Judgment – Separation of Powers** ...................85

**Count III:     Declaratory Judgment – Free Exercise** ............................88

**Count IV:      Declaratory Judgment – Political Speech** .........................90

**Count V:       Declaratory Judgment – Substantive Due Process** ...............91

**Count VI:      Civil Money Damages Pursuant to 42 U.S.C. § 1983** ...........96

**VII.  PRAYER FOR RELIEF** ...................................................................96

**VIII.  JURY DEMAND** ...........................................................................97

## I.  <u>SUMMARY OF THE CASE</u>

"In all tyrannical governments the supreme magistracy, or the right both of making and of enforcing the laws, is vested in one and the same man, or one and the same body of men; and wherever these two powers are united together, there can be no public liberty."

*William Blackstone*

"Absolute and arbitrary power over the lives, liberty and property of freemen exists nowhere in a republic, not even in the largest majority."

*Kentucky Constitution § 2*
<u>*Absolute and Arbitrary Power Denied*</u>

1.      Over 110 years ago, at a time when medicine was not yet sufficiently advanced to have developed penicillin and the germ theory of medicine was still new, the Supreme Court of the United States made a ruling related to a citizen's rights in healthcare that has remained largely unaddressed to this day. Over the century plus of time that has since passed the court has decided many critical cases revolving around individual rights that have never been squared with Jacobson. Jacobson v. Massachusetts, 197 U.S. 11 (1905).

2.      A century ago, many of our most sacred and fundamental rights were still being sorted out. Suffrage had not yet occurred, civil rights barely existed, critical cases on fundamental rights such as interstate travel and bodily privacy had not come into play and the administrative state that we live in today simply did not exist.

3.      Today, under the guidance of an unelected administrative structure, many of the rights our Supreme Court has determined are fundamental under our

Constitution are being denied. These fundamental rights are being denied, not out of prudence, they are being denied due to unfounded deliberately induced fear and intentional manipulation.

4.      But all is not lost. In its wisdom, the *Jacobson* court made clear that it never intended its decision to bar further review. To the contrary, the Court in *Jacobson* specifically stated:

> "Before closing this opinion, we deem it appropriate, in order to prevent misapprehension as to our views, to observe -- perhaps to repeat a thought already sufficiently expressed, namely -- that the police power of a State, whether exercised by the legislature or by a local body acting under its authority, may be exerted in such circumstances or by regulations so arbitrary and oppressive in particular cases as to justify the interference of the courts to prevent wrong and oppression." (*Id*, 197 US 38)

5.      For more than a year now, the people of the Commonwealth of Kentucky have lived under the cloud of a "state of emergency" that is a legal construct, a unilateral and unnecessary proclamation by Governor Beshear, (the "Emergency")[1], which Governor Beshear has declared, in recently promulgated Emergency Administrative Regulations, will exist as long as "...the global pandemic caused by Covid-19 is ongoing...".[2] During this Time, Governor Beshear has used his veto powers, executive orders, procedural sleight of hand, and even the Court system to unilaterally seize power and retain it against the manifest will of the people as expressed through their elected legislators, in an astounding abuse of his

---

[1] Governor Beshear's original Executive Order declaring a state of emergency can be viewed here: https://governor.ky.gov/attachments/20200306_Executive-Order_2020-215.pdf .

[2] Governor Beshear's "Statement of Emergency" attached to Emergency Administrative Regulations" as filed on March 05, 2021 can be viewed here: https://apps.legislature.ky.gov/Law/kar/902/030/210E.pdf .

Executive authority. Virtually all power has been concentrated in the hands of the Governor, and he has wielded it destructively, with the active co-operation of the other Defendants to this Lawsuit.

6.      Throughout this time of 'declared emergency' the Governor has issued a series of confusing, contradictory, and ultimately arbitrary and capricious Executive Orders[3] predicated upon the Emergency that he unilaterally declared. Unelected executive agency officials in the KDPH (KY Department for Public Health) and the KCHFS (KY Cabinet for Health and Family Services)(*collectively* Team Kentucky), have issued their own alerts, advisories, checklists, pronouncements and/or plans, and they are equally unclear and arbitrary (the Executive Orders and KDPH,[4] and KCHFS alerts, advisories, checklists, pronouncements and/or plans flowing from the Emergency declaration are referred to hereinafter as the "Emergency Mandates").  The Emergency Mandates are an extensive web of detailed and substantive rulemaking of a kind ordinarily undertaken by a legislature – or at least, through notice-and-comment rulemaking. It is worth noting that *one day shy of a year* after Governor Beshear declared a State of Emergency in an Executive Order that admitted within it's own text that it was a pre-emptive declaration just in case an Emergency did actually strike, he, together with Steven J. Stack, Commissioner of KDPH, and Eric C. Friedlander, Secretary of KCHFS, filed a notice-and-comment set

---

[3]    Governor    Beshear's    Executive    Orders    can    be    viewed    here: https://governor.ky.gov/covid19 (last visited April 1, 2021) and here: https://governor.ky.gov/Documents/20201020_COVID-19_page-archive.pdf (last visited April 1, 2021).

[4] Kentucky Advisories, Emergency Mandates, Executive Orders and other related documents can be viewed here: https://govstatus.egov.com/kycovid19 (last visited April 1, 2021).

of Emergency Administrative Regulations in which the Declared Emergency was defined as an Emergency which has been declared, and offers as his sole justification that the Global Pandemic has not gone away. As long as the "...global pandemic caused by covid-19 is ongoing..." these "Emergency Administrative Regulations [will be needed] ...to address the imminent threat to public health."[5]

7.     These new "Emergency Administrative Regulations" make it a criminal offense to refuse to "***cover the face***", according to the dehumanizing language that Governor Beshear has accorded to his unhealthy mask mandate. Anyone violating said Mask Mandate, has committed a Class A Misdemeanor and can be arrested without even a warrant by any uniformed member of law enforcement. There is great ambiguity as to what happens next, because arrest and presumably imprisonment are set forth in 902 KAR 2:211E,[6] but this same "Emergency Administrative Regulation" mentions levels of fines, being denied service at the business, and civil and criminal penalties for individuals who do not "***cover the face***". Businesses who allow a "citizen" to enter who has failed to "***cover the face***" are subject to a similarly bizarre range of penalties. They can be fined as little as $25 or the entire Business can be summarily shut down, apparently at the whim of any variety of unelected bureaucrats from the state to the local level. No guidance is offered in the "Emergency Regulations" as to when the local or state bureaucrats should either sock the business with a $25 dollar fine or simply shut down the business entirely, thereby utterly devastating the Owner of the Business together

---

[5] Governor Beshear's Statement of Emergency can be viewed here:
https://apps.legislature.ky.gov/Law/kar/902/030/210E.pdf
[6] https://apps.legislature.ky.gov/Law/kar/902/002/211E.pdf

with the employees and their families. In the meantime, law enforcement has been authorized by the "Emergency Administrative Regulation" to imprison, without a warrant, <u>any individual</u> seen violating this unhealthy mandate. (The faulty science behind the unhealthy mask mandates is addressed below, in a separate section).

8.      The Emergency Mandates have stripped the people of this Commonwealth of their fundamental rights and dignity.  Our daily lives are now directly and comprehensively micromanaged by the summary edicts of unelected bureaucrats and executive officers.  We have been ordered, under threat of criminal prosecution, to stay in our homes, to shut down our "non-essential" businesses, to mask ourselves, to submit to painful and invasive testing of at best dubious efficacy, and to quarantine and isolate ourselves and our children from others, even our loved ones, for extended periods of time.  We have been excluded from our schools and places of worship, and the form of our worship has been transmogrified into something almost unrecognizable.  Our access to routine medical care has been cut off.

9.      The proffered justification for this trampling of constitutionally derived civil liberties is the SARS-CoV-2 virus, and the COVID-19 disease that it can cause in some of the people it has infected.  When it first appeared in our State in March 2020, COVID-19 was claimed to be new (albeit a strain), and reliable data and experience was limited.  A year later, however, we are well past the nascent stage.  Conditions on the ground have changed, and we have access to far more reliable data.

10.     The evidence that COVID-19 is nowhere near as dangerous as originally predicted has steadily mounted, and is now overwhelming.  Most people who contract COVID-19 have only mild symptoms comparable to those of the seasonal flu.  The KDPH Website reports that as of April 01, 2021 there were 5,522 "confirmed" deaths, representing .12% of Kentucky's population census, as reported to the US Census Bureau on July 01, 2019.[7]  In fact, the true percentage of deaths is even lower than the .12% stated above, because the population of Kentucky has increased since the US Census most recent published data from 2019. Additionally, COVID-19 does not present the same risk uniformly to the entire population of the State.  Fully 93% of all deaths attributed to COVID-19 have occurred in the 60-and-over age group, and 75% of all deaths attributed to COVID-19 have occurred in the 60-and-over age group.  More than 80% of the State's population is not included in that demographic.  Only two people under the age of 20 have died (tragically) of COVID-19 in Kentucky, according to the state's statistics, which themselves are questionable in light of the special rules relating to cause of death that have been promulgated in violation of federal statute, and which are detailed and challenged below.  Approximately 75% of all Kentuckians who are 70 or over and who the state declares contracted COVID-19, have survived it.[8]

11.     All life is precious, but these figures and rates do not even come close to approaching the dire forecasts and models presented to the people in March of

---

[7] KDPH Website, last viewed on April 1, 2021 can be viewed here: https://govstatus.egov.com/kycovid19 . The US Census data for KY can be viewed here: https://www.census.gov/quickfacts/KY .

[8] https://www.wcpo.com/news/coronavirus/live-beshear-gives-kentucky-covid-19-update-march-31 (last viewed on April 1, 2021).

2020. COVID-19 lags far behind heart disease, cancer, accidents, chronic lower respiratory disease, stroke, Alzheimer's disease, drug overdose and diabetes as a cause of death in Kentucky,[9] and these are all conditions for which no emergency has been or ever will be declared.

12.     Once the numbers are adjusted for those who died FROM Covid-19, as opposed to those who died WITH Covid-19, in accordance with the 2003 Coroners Handbook (more on this below), it is likely that the true Covid-19 death rates will also be shown to lag behind kidney disease, septicemia and the flu/seasonal influenza as a leading cause of death in Kentucky.

13.     There are now multiple vaccines in circulation, and an estimated 70% of Kentuckians 70 or over have already been vaccinated.[10] The State's healthcare infrastructure has not been overwhelmed as was forecasted, even during times of peak rates of infection.[11] Whereas the State represented that it had or may have had inadequate testing capacity in March 2020, it has since expanded it and is currently bragging about being ahead of President Biden's projected goals for "vaccination.". Studies suggest the population may have already reached or is approaching the threshold for natural or "herd" immunity. Nevertheless, on March 31, 2021 Governor Beshear held a press conference in which he referred to the non-FDA

---

[9] Most recent leading causes of death in Kentucky from the CDC can be viewed here: https://www.cdc.gov/nchs/pressroom/states/kentucky/kentucky.htm . CDC reporting on the 12 month Covid-19 death rate can be viewed here: https://www.cdc.gov/nchs/pressroom/states/kentucky/ky.htm .
[10] https://www.wcpo.com/news/coronavirus/live-beshear-gives-kentucky-covid-19-update-march-31 (last viewed April 31, 2021).
[11] Supporting Team Kentucky Reports can be viewed here: https://chfs.ky.gov/Pages/cvdaily.aspx?View=March%202021%20Daily%20Summaries&Title=Table%20Viewer%20Webpart . (last viewed April 1, 2021).

approved "vaccine" as a "shot of hope" and spent time talking about the number of minors he hoped to inject. He featured a Dr. Neeli Bendaputi who pushed hard on the message that "masking" ("**_covering the face_**") and taking "your shot" (a phrase she uses repeatedly) will allow 4,000 to 5,000 "Citizens" to get "their shot" daily, at their new cardinal stadium facility. Governor Beshear boasts that this new capacity to inject citizens puts us ahead of President Joe Biden's stated goal by at least a month. The clear message is that the "vaccine" will somehow put us at herd immunity and that Kentucky is well ahead of the curve. In fact, by getting "your shot" you will somehow help defeat Covid-19 "for good", according to Governor Beshear. [12] Nevertheless, Governor Beshear has "declared" that as long as there is a "global epidemic" caused by Covid-19, Kentucky will remain in the limbo of an unending "state of emergency". One is reminded of the "Grand Opening" sign that hangs year after year over the latest automobile dealership, because no one remembers to take it down and, after all, it may draw a new and unsuspecting customer.

14.     There are excellent grounds to conclude that the COVID-19 "death" and "case" data reported by Team Kentucky is inflated. The data is driven by polymerase chain reaction ("PCR") testing, testing which has been shown to be seriously flawed, and when administered in accordance with the manufacturer's own guidance produces false positive results in 97% of tests.  The data is also driven by new rules, created especially for COVID-19 and applicable only to COVID-19, for

---

[12] The video news conference from March 31, 2021 can be viewed here: https://www.wcpo.com/news/coronavirus/live-beshear-gives-kentucky-covid-19-update-march-31 . (last viewed April 1, 2021).

reporting the cause of death, on death certificates, which can result in deaths being counted as COVID-19 deaths, even where other fatal, underlying and pre-existing conditions are noted. The data also includes so-called "probable cases" which allows Team Kentucky to count those presenting with symptoms indistinguishable from influenza and a number of other maladies as COVID-19 cases.

15. Fear-based appeals have been used to manipulate the public and have been the core justification for nearly a year of consistently unlawful behavior by the Commonwealth. The citizens of Kentucky are bombarded relentlessly by fear messages on television and newspapers, on the Internet, and on flashing highway signs. It is not easy for the lay public to evaluate or challenge the messaging independently, since it invokes complex science, medicine and statistical analysis. At the same time, the corporate operators controlling access to the virtual public square have censored those who have sought to present the information and arguments set forth in this Complaint to the broader public. Plaintiffs and many others have expressed their genuine fear of retaliation for questioning the mandates, and have overcome that fear in order to bring this lawsuit.

16. The Emergency Mandates are experimental, unnecessary, and they have caused more harm than good. There is no obvious or provable correlation between the Emergency Mandates and positive COVID-19 outcomes. There is no compelling scientific evidence that people without COVID-19 symptoms are transmitting COVID-19 to others. At the same time, these Emergency Mandates, purportedly intended to protect the people, have triggered their own, far worse, and more costly "epidemic" - of suicide, drug overdose, social isolation, domestic

violence, mental health crises, academic failure, furloughed health care workers, imploding consumer spending, unemployment and permanent business closures across the State.

17. The real "emergency" is not one caused by SARS-CoV-2 or COVID-19. No, the real emergency has been caused by the legal construct of the Emergency itself, and by the Emergency Mandates themselves, and both have precipitated a true Constitutional crisis. A state operated by unchecked police power for an extended and potentially indefinite time, is a police state.

18. To date, citing the "precautionary principle," the Court has shown great deference when reviewing the State's exercise of its police powers. A year after COVID-19 first appeared in Kentucky, we are no longer in the "nascent stage." There is a well-developed factual record, and the judicial deference that characterized the Court's early review of certain Emergency Mandates is not appropriate. As Chief Justice Roberts has said:

> [T]he Constitution principally entrusts the safety and the health of the people to the politically accountable officials of the States. But the Constitution also entrusts the protection of the people's rights to the Judiciary—not despite judges being shielded by life tenure, but because they are. Deference, though broad, has its limits. S. Bay United Pentecostal Church v. Newsom, 2021 U.S. LEXIS 758 * 4 (internal quotation marks omitted).

Plaintiffs have been grievously injured by these unconstitutional Emergency Mandates. They ask the Court to grapple anew with fundamental questions about the constitutional limits of the police power of the State, to restore the constitutional order and to preserve and protect their liberties.

19.     As a threshold matter, Plaintiffs challenge the continuation of Governor Beshear's Emergency.  They ask the Court, in accordance with <u>Home Building & Loan Assn. v. Blaisdell</u>, 290 U.S. 398, 442 (1934) ("Whether the emergency still exists upon which the continued operation of the law depends is always open to judicial inquiry."), and <u>Chastleton Corp. v. Sinclair</u>, 264 U.S. 543, 547 (1924) ("A law depending upon the existence of an emergency or other certain state of facts to uphold it may cease to operate if the emergency ceases or the facts change."), to examine the underlying premise for the Emergency and the Emergency Mandates, namely, that SARS-CoV-2 and COVID-19 were at the relevant times, and are now, a true public health emergency.  Under <u>Blaisdell</u> and <u>Sinclair</u>, the Emergency and the Emergency Mandates must end, if the underlying emergency has ended.

20.     Plaintiffs also challenge the constitutionality of the Emergency Administrative Regulations, which include granting warrantless arrest powers to uniformed law enforcement who witnesses a failure to "cover the face", as a violation of the separation-of-powers enshrined in Kentucky's Constitution and the non-delegation doctrine.

**In addition, we humbly ask the Court in this case to**:

21.     Reaffirm its position as a coequal branch of the government with the power and authority to review, and if warranted, declare unconstitutional actions taken by the executive.

22.     Reaffirm the US Constitution is the supreme law of the land and that rights, especially fundamental human rights, may not be abridged unless necessary

to serve a compelling governmental interest, and that even then, those restrictions must be narrowly tailored to meet a compelling governmental interest.

23.    Ensure there is an opportunity for redress under any emergency declaration. In fact, it is when exigent circumstances exist and public officials base decisions and orders on an emergency basis, that courts have warned that special care needs to be taken to insure that Constitutional rights are not abridged.

> "(T)he judiciary cannot dispense with constitutional principles, even in response to a dire emergency. Indeed, it is in the midst of emergencies that constraints on government power are most important. …. History teaches that grave threats to liberty often come in times of urgency, when constitutional rights seem too extravagant to endure… [W]hen we allow fundamental freedoms to be sacrificed in the name of real or perceived exigency, we invariably come to regret it." Skinner v. Railway Labor Executives' Ass'n., 489 U.S. 602, 635 (1989) (Marshall, J., dissenting)…[13]

24.    Recognize that the political process and operative orders are invalid if based on false or misleading information[14] and recognize the criticality that all future emergency orders be based and maintained on clear, honest verifiable facts - particularly when such orders infringe on Constitutional rights.

---

[13] "Experience should teach us to be most on our guard to protect liberty when the Government's purposes are beneficent. Men born to freedom are naturally alert to repel invasion of their liberty by evil minded rulers. The greatest dangers to liberty lurk in insidious encroachment by men of zeal, well-meaning but without understanding." Olmstead v. United States, 277 U.S. 438, 479 (1928) (Brandeis, J., dissenting) (overruled in part on other grounds by Katz v. United States, 389 U.S. 347 (1967))." See Justice Bradley's concurring opinion in Wisconsin Legislature v. Secretary-Designee Andrea Palm, Julie Willems Van Dijk and Lisa Olson, In Their Official Capacities As Executives of Wisconsin Department of Health Services, 2020 WI 42.

[14] In Romero v Evans, 517 U.S. 620, 631 (1996) the Court stated actions must bear a rational relationship to some legitimate end. It necessarily follows that if the actions are based on false or fraudulent information that no rational relationship could be found.

25.     Underlying all of this, and the foundation of this case is this question: if an emergency can be declared without the appropriate level of review based on the rights being limited, and under the guise of that emergency, all rights are only subject to a rational basis review, how then do any previous judicial opinions or Constitutional principles have any meaning whatsoever? Further, if under the same circumstances different levels of scrutiny are applied to the various rights being limited under an emergency declaration than would otherwise be applicable, what is the value of having various levels of review?

**Plaintiffs additionally request the Court do the following:**

26.     Grant a preliminary injunction against all current state actions and orders in effect in Kentucky issued under the COVID-19 Emergency Declaration and against the declaration of emergency itself until this case has been decided by the court. We further ask the Court to review this emergency declaration and request for preliminary injunction under the strict scrutiny standard of review since fundamental Constitutional rights have been abridged under the guise of the emergency actions.

a.   Declare that the exigencies underlying the declaration for emergency no longer exist.

b.   Declare that the public health emergency based on the March 06, 2020 Executive Order has ended.

c.   Declare that all restrictions now existing in response to what might have been an emergency in the beginning, are now invalid.

d.  Grant injunctive relief against future public health emergency declarations in the Commonwealth of Kentucky without enabling legislation within 30 days from the declaration of public health emergency.

e.  Grant injunctive relief against enforcement of any existing penalties or fines against any person as a result of violations of orders which this Court determines to be invalid.

f.  Grant permanent injunctive relief against future actions taken under the guise of this public health emergency which are contrary to the ultimate decision of this court.

g.  Declare that the lowest standard of review available under an emergency declaration is intermediate scrutiny though higher standards are still available.

h.  Grant permanent injunction against future public health emergencies for more than an extremely limited period of time without regular reauthorization by the legislative body.

i.  Award damages, including punitive damages, for Plaintiffs in an amount determined appropriate by the fact-finder pursuant to 42 U.S. Code § 1983.

## II.  STANDING, VENUE AND JURISDICTION

27.  This Court exercises subject matter jurisdiction in accordance with the provisions of 28 U.S.C. § 1331, as this litigation involves multiple claims and

issues arising under the 1st, 4th, 5th, 6th. 9th and 14th Amendments to the U.S. Constitution, and related precedent.

28.     This Court exercises subject matter jurisdiction in accordance with the provisions of 42 U.S.C. § 1983, as this litigation involves the deprivation of rights, protections, privileges and immunities secured by the U.S. Constitution.

29.     There is a "case or controversy" within the meaning of Article III of the federal Constitution since *inter alia* neither the termination of the Emergency nor the relaxation or rescission of individual Emergency Mandates can moot the claims for civil money damages asserted under 42 U.S.C. § 1983.  As for the Plaintiffs' requests for injunctive relief, the Defendants can unilaterally increase the severity of previously relaxed Emergency Mandates, or reinstate those that have been rescinded, at any time while the current so-called Emergency persists or is reintroduced.   "It is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice."  Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 189 (2000).

30.     This Court exercises supplemental jurisdiction over related Kentucky state law claims under 28 U.S.C. § 1367.

31.     Venue lies in this Court under 28 U.S.C. § 1391(b)(1), since at least one Defendant resides in this judicial district, and all Defendants reside in Kentucky.

32.     Plaintiffs have standing to bring this litigation, since they can establish that (1) they have suffered some actual or threatened injury, (2) the injury can fairly be traced to the challenged actions of the Defendants, and (3) the injury is likely to

be redressed by a favorable decision of this Court. <u>N.H. Lottery Comm'n v. Rosen</u>, 2021 U.S. App. LEXIS 1526 *15-17, quoting <u>Lujan v. Defs. of Wildlife</u>, 504 U.S. 555, 560 (1992).

### III.  THE PLAINTIFFS

33.     Plaintiffs are residents of various counties in the Commonwealth of Kentucky and have suffered injuries as a direct and proximate result of the imposition of the Emergency Declaration and the Emergency Mandates, which have infringed their civil liberties guaranteed under the U.S. Constitution and the Constitution of the Commonwealth of Kentucky.

34.     Plaintiffs are, as follows:

35.     **Larry Nichols and Joshua Nichols** (the "Nichols") are a father and son team who engage in Prison Ministry as followers of Christ. Larry Nichols has been engaged in his Christian Ministry as a volunteer prison chaplain for twenty years. Joshua Nichols has engaged in Christian Ministry with his father as a volunteer prison chaplain and separately as an ambassador of The Gideon's International in Kentucky's jails, for more than a decade. In his capacity as a Gideon, a significant part of Joshua's ministry is to bring the Good News of the Gospel of the Christian faith to the inmates of Kentucky's jails in the form of the Word of God. The Nichols believe that God's word is relevant and powerful to bring about hope, joy and redemption for those who read it and apply God's truth to their lives. Through their ministry they seek to begin with the transformative power of the gospel and to continue with discipleship, ministry and worship through prison and beyond; with life coaching, shared faith and worship, and remaining connected to each inmate

after they leave prison. They have dedicated a substantial portion of their lives to helping Kentucky's prison and jail inmates experience God's grace and redemption and then to walk with them in their life journey as together they apply God's truth to their lives. This ministry, in all of its various parts, constitutes the deepest expression of the Nichols' faith.

36.     The Nichols have been damaged by being deprived of the right to exercise their religious faith and congregate with their inmate congregation during the lockdown. They have been deprived of experiencing the presence of the Holy Spirit that comes when they share worship with their congregation through prayer, bible study and discipleship. They have been stripped of the joy and peace that comes from knowing that they are freely following the commands of Jesus in their daily life and ministry. Further they have been damaged by the daily anxiety and concern they experience from knowing that their congregation has been completely deprived of everything described above because, as inmates during lockdown, they cannot even congregate with each other during this time of religious deprivation.

37.     **Wesley Anglin** is a Kentucky prison inmate. Wesley is a young man with a deep and profound faith in God. Wesley has for quite some time ministered to his fellow inmates both personally and through his involvement in two separate family-owned ministries, where he and his family provide guidance and affordable materials to other believers to assist them in their practice of Judaism.

38.     As part of the practical expression of his faith, Wesley is working closely with a Kentucky Senator to bring about legislation that he prays will improve the lives of his fellow inmates.

39.     When the visitation was arbitrarily shut down by Executive Order in March of 2020, as a member of the Jewish faith community, Wesley was immediately deprived of the presence of a Rabbi in his life. For the complete and free expression of his faith, congregational meetings with a Rabbi present, *and* a minion (or a "quorum") of fellow believers present, are necessary before certain prayers and acts of worship can be performed. These prayers and acts of worship which Wesley has been deprived of are integral to honoring a holy God and a necessary part of the free and full expression of his faith.

40.     In addition to the above-described deprivations, Wesley has been deprived of the opportunity to spend individual time with the Rabbi. As a part of Wesley's spiritual growth, he has been accustomed to having regular opportunities to "sit at the feet" of the Rabbi and absorb his teachings and learn from him. A Rabbi previously did that with Wesley following service, and Wesley is currently unable to experience the full expression of his faith without that.

41.     In addition, Wesley's faith requires honoring the Sabbath, which is done as a family. In Wesley's faith, honoring the Sabbath is not optional. It is the fourth commandment in the old testament and is also commanded elsewhere in the old testament. Honoring the Sabbath is a way of not only honoring the commands of God but actually participating in His holiness and experiencing a foretaste of eternity by holding sacred the seventh day of creation. Judaism is a religion whose expressions of faith and sacred practices revolve around holiness in time.

> "Shabbat comes with its own holiness; we enter not simply a day, but an atmosphere. My father cites the Zohar: **the Sabbath is the name of God. We are within the Sabbath rather than the Sabbath being within us.** For my father, the question is how to perceive that

holiness: not how much to observe, but how to observe. Strict adherence to the laws regulating Sabbath observance doesn't suffice; the goal is creating the Sabbath as a foretaste of paradise. **The Sabbath is a metaphor for paradise and a testimony to God's presence; in our prayers, we anticipate a messianic era that will be a Sabbath, and each Shabbat prepares us for that experience: "Unless one learns how to relish the taste of Sabbath … one will be unable to enjoy the taste of eternity in the world to come."** It was on the seventh day that God gave the world a soul, and "[the world's] survival depends upon the holiness of the seventh day." The task, he writes, becomes how to convert time into eternity, how to fill our time with spirit: "Six days a week we wrestle with the world, wringing profit from the earth; **on the Sabbath we especially care for the seed of eternity planted in the soul. The world has our hands, but our soul belongs to Someone Else."** (emphasis added) — Abraham Joshua Heschel, <u>The Sabbath</u>

42.     It is not an overstatement to say that the entering into the Sabbath is central to Judaism, and that upon which the rest of the faith pivots, as an understanding of God and our place in time and eternity. The honoring (or keeping) of the Sabbath (Saturday) is entered into as a family. Every individual in the family participates uniquely in this sacred day, this holy moment in time. They teach and they learn, each from the other, elder to younger. The teaching is as much an act of worship as the learning, and the two cannot be separated. Prayers and blessing are recited, each at different times throughout the Sabbath day. Food is taken in as an act of worship, with the food being of specific types and taken at specific times. The older in the family instruct the younger and the entire family enters the holy space of the Sabbath together. When the family is torn asunder through forcible separation, the expression of worship that occurs when they enter the Sabbath as a whole, becomes torn asunder as well. Wesley's family once visited him regularly on Saturdays, and they honored the Sabbath as a family. They visited on Saturdays, rather than any other day, for the express purpose of keeping the Sabbath as a

family. Wesley's niece, at six years old, has almost never missed a family Sabbath with Wesley, and one of their mutual joys was for her to "sit at his feet" and learn from him as part of honoring the Sabbath.

43.     With the arbitrary cessation of visitation by Executive Order, Wesley has been deprived of every means of religious expression and practice described above. He is unable to congregate with fellow believers while incarcerated. He has been denied access to a Rabbi and thereby denied access to each and every one of the necessary expressions of his faith that rely upon the presence of a Rabbi. Perhaps most significantly, Wesley is no longer able to enter the holiness of the Sabbath with his family.

44.     Wesley has been damaged by being deprived of the right to exercise his religious faith and congregate with his fellow inmate believers during the lockdown. He has been deprived of experiencing the presence of God that comes when he shares worship with his fellow believers. He has been stripped of the sense of fulfillment that he gets from the ministry that he does with his father by providing guidance and affordable materials to other believers to assist them in their practice of Judaism. He has been stripped of the joy and peace that comes from keeping the Sabbath with his family and the joy and peace that comes from sitting at the feet of knowledge and experiencing spiritual growth in the knowledge of God under the guidance of his Rabbi.

45.     **Frank Anglin** and **Maggie Anglin** (Frank and Maggie) are Wesley Anglin's mother and father. They are partners in two related faith-based ministries with him. Because of the Executive Order that arbitrarily stopped all visitation more

than a year ago, in the name of the so-called Emergency, Frank and Maggie have been denied the free and full expression of their faith and deprived of the joy and the fulfillment of ministering to Kentucky inmates with Wesley. They view this ministry as a calling, the fulfillment of which is integral to the expression of their faith. In addition, they have been stripped of the joy and peace that comes from keeping the Sabbath with their entire family, which is a central tenant of their faith. As grandparents of Wesley's niece, and as devout practitioners of a religious faith concerned with holiness in time, it is especially meaningful to Frank and Maggie that they honor the Sabbath with their granddaughter. The multi-generational component of this act of worship deepens the meaning within their faith in a way that is priceless.

46.     Frank and Maggie have been damaged by being deprived of the right to exercise their religious faith as a family and through their ministry, as integral expressions of their faith. They have been further damaged by being deprived of experiencing the presence of God that comes from keeping the Sabbath as a family and from fulfilling their calling through the inmate ministries with Wesley. They have been stripped of the sense of fulfillment that they get from the ministry that they do with Wesley by providing guidance and affordable materials to other believers to assist them in their practice of Judaism. They have been stripped of the joy and peace that comes from keeping the Sabbath with their intact family.

47.     **Robin Harbolt** is the mother of the **minor child P.H.** (Robin and P). Together, Robin and P are Wesley's sister and niece, and the daughter and grand-daughter of Frank and Maggie. Because of the Executive Order that arbitrarily

stopped all visitation more than a year ago, in the name of the so-called Emergency, they have been denied the free and full expression of their faith and stripped of the joy and peace that comes from keeping the Sabbath with their entire family, which is a central tenant of Judaism. As the mother of P, it is especially meaningful to Robin that her daughter can participate with the entire family including her grandparents in the keeping of the Sabbath, and the denial is therefore especially devastating.

48. Prior to the so-called pandemic emergency, P had never known a time in her life when she could not celebrate and keep the Sabbath with her uncle Wesley. The one stabilizing religious foundation in her life has been the keeping of the sabbath with her mother and grandparents and her uncle Wesley. The Executive Order ending visitation has torn that foundation from beneath her feet, creating feelings of deep sadness, confusion and loss. This, combined with the psychologically terrifying specter of masks almost everywhere she looks, has had a devastating effect on her.

49. Robin and P have been damaged by being deprived of the right to exercise their religious faith as a family, as an integral expression of their faith. They have been further damaged by being deprived of experiencing the presence of God that comes from keeping the Sabbath as a family with Wesley. They have been stripped of the joy and peace that comes from keeping the Sabbath holy with their intact family. P has been uniquely damaged in that she lacks the capacity to process the reasons for which this was done to her.

50. **Charles W. "Jeep" Burton (Jeep)** is a former Kentucky inmate who was granted compassionate release and set free from incarceration on September

09, 2020. Prior to being released he spent 26 years as a volunteer inmate Chaplain, practicing his Christian faith by ministering daily to other Kentucky inmates. Jeep's ministry included leading worship services, prayer meetings and bible studies with other inmates. When the Executive Order restricting all visitation was implemented, Jeep was immediately stripped of the ability to minister as a volunteer chaplain and congregate with other inmate believers. Jeep was told he could not engage in the ministry he had been accustomed to for over a quarter of a century because of the limitations of social distancing, yet he was left to bunk three feet below a fellow inmate, subject to the rules of gravity with every exhalation from the bunk above him.

51.     After Jeep was released, he immediately sought permission to re-enter the prisons as a volunteer Chaplain but was denied his ministry because of the same Executive Order denying all visitation. Jeep views his ministry as a calling on his life from God and engaging in that ministry so that other inmates might come to know the life changing power of Christ in their life is necessary for the full and complete expression of his faith.

52.     Charles has been damaged by being deprived of the right to exercise his religious faith and congregate with his fellow inmate believers during the lockdown. He has been further damaged by being deprived of experiencing the presence of God that comes when he shares corporate worship with his fellow believers. He has been stripped of the sense of fulfillment that he gets from the ministry that allows him to fulfill Jesus's commandment, to go and make disciples.

He has been stripped of the joy and peace that comes from growing together with fellow inmates through prayer, worship, and Bible study.

53.     With regard to the preceding Plaintiffs, secular authorities may show "insufficient appreciation or consideration of the interests at stake" when fashioning COVID-19 mandates and assessing their impact on religious liberty interests and free exercise. S. Bay United Pentecostal Church v. Newsom, 2021 U.S. LEXIS 758 * 3.

54.     **Matt Schweder** and **P. Schweder** (Matt and P, respectively) are a father and his minor daughter. Matt and P share a special bond through their love of the game of soccer. Matt played soccer in his youth and after P was born, Matt taught her to love the "beautiful game" as well. As P grew up, Matt coached her and they played soccer together in the yards and pitches that they had access to. In this way they strengthened their bond, their relationship, and their love for the game. Matt coached girls select soccer for years and, as a rule, never missed one of P's soccer matches. As P entered high school, Matt was always there on every sideline, her greatest encourager and fan. After games they would laugh and talk or sit silently, processing the match and generally enjoying each other's company.

55.     In, addition, over the years, Matt established friendships and connections with other soccer parents and enjoyed seeing, greeting and chatting with them at P's matches.

56.     When the 2020 soccer season was about to begin, Matt and P received a communication from the Coach at Lafayette High School that all girl soccer players should wear a mask from the entrance gate surrounding the athletic field, to the bench. Matt was aware that masking was ineffective against covid and generally

harmful to the wearer. Together they decided that P would not wear a mask to the bench. She did not do so and was not asked to do so by anyone during preseason practice.

57.     Matt entered into dialogue prior to the first soccer match of the season with James McMillin, Chief of Fayette County Public High Schools; Rob Sayre, Athletics Director of Fayette County Public Schools; Brian Jacobs, Principal of Lafayette High School; and Littleton Ward, Athletic Director for Lafayette High School; and eventually counsel for Fayette County Public Schools.

58.     The purpose of these conversations was to determine what, if any, policy existed regarding masks and what, if any enforcement mechanism was in place regarding masking at an outdoor soccer match. Matt was able to determine that no policy actually existed, and James McMillin advised Matt that the school had no authority to enforce a masking requirement. At no time during any of these conversations did anyone advise Matt that he should bring some sort of written exemption with him to the soccer matches.

59.     At the first match of the season, Matt went to the field watch his daughter play, as he had her entire life as a soccer player. Upon entering the Athletic field, Matt was almost immediately accosted by Littleton Ward, Athletic Director for Lafayette High School (Ward). Ward demanded to know whether Matt had a mask or not. Matt said he did not, whereupon Ward advanced upon him cursing and ordering him to immediately leave the complex. Ward was in the immediate vicinity of law enforcement. The officers stepped in front of Ward for the purpose of restraining him from physically assaulting Matt. The scene was disturbing and

embarrassing for P, especially considering all of the communication that Matt had engaged in to ensure that his attending the game without a mask would not be a problem. During this engagement Matt advised that he had a medical condition; that forcing him to leave was a violation of the ADA; and that the masking order in place at the time in Kentucky permitted exemptions for those in his condition. Ward refused to accept any of the arguments that Matt presented and remained violent and aggressive while demanding coarsely that Matt get out.

60.     Matt went outside of the complex and called some officers over to ask them to confirm that they had seen him forced to leave. One or more school officials approached and told Matt to simply get a medical exemption in writing and that was all he needed.

61.     Matt's wife is a nurse practitioner and could have written a medical exemption for him. However, Matt thought that having an exemption written by his wife might be viewed as some sort of a conflict by school officials, so he went to a different doctor. The doctor examined Matt thoroughly, asking him relevant questions, and willingly granted him a written exemption. Because the doctor was busy he asked Matt to prepare a simple written exemption and bring it by for signature. Matt did so. The doctor added a small handwritten modification to the exemption and signed it.

62.     Matt presented the written exemption to the school as they had instructed him to do. However, instead of honoring the written exemption as they had represented, they advised Matt that it was not acceptable because it did not contain a letterhead. when Matt attempted to have the exemption placed on

letterhead the doctor refused to talk to him and it became apparent that somebody had called the doctor and convinced him not to permit Matt to put the exemption on the office letterhead.

63.     During this process, on one or more occasions, Fayette County Public Schools created and then modified a policy after the fact to justify denying Matt entry to his daughter's soccer games.

64.     Matt presented his exemption and inquired of the various high schools that hosted away soccer games in advance to determine whether he would be allowed in. Only one school honored the exemption and allowed him to come inside the fence and watch his daughter play soccer. Matt was forced to either miss or watch from a distance outside of the fence every one of his daughter's soccer matches.

65.     P's 2020 high school soccer season was historically successful, which exacerbated the pain and sadness for both Matt and P that Matt could not be at the side of the field to cheer and encourage her as he had since she was 4 years old.

66.     Matt and P have been damaged through the trampling of their constitutional rights, as set forth herein and below.

**67.     Kenneth L. Kearns II**, ("Ken"), is an individual whose doctors discovered cancerous polyps in his face in 2017. The polyps were numerous and quite large and within a centimeter or so of the risk that in surgery he could lose many critical functions including his sight, his throat, his brain, his hearing, and the use of his mouth. His doctors advised him that it would take at least 15 surgeries,

plus chemotherapy, and that he had approximately a 5 percent chance of surviving the process.

68.     Ken courageously chose to go forward with the program of surgeries and chemotherapy, and over the next several years he underwent 14 massively invasive surgeries.

69.     These surgeries included (without limitation), the following:

a.     Ken's throat was cut open from side to side in an operation known as a "pirate's smile" to work inside his neck. The incision cuts more than halfway around his throat from the front and necessitated grafting in a large number of replacement veins which were taken from Ken's forearm;

b.     The flesh and veins were removed from his left wrist to his elbow in order to replace and re-graft the veins in his throat;

c.      The wrist bone was cut and a section removed from Ken's left arm in order to rebuild lost bone in his face;

d.     Metal hardware was installed in Ken's left forearm to bridge the bone structure voids where his wrist bone had been removed;

e.     Shark skin and/or cartilage was grafted onto on Ken's forearm to cover the metal hardware where he lacked the remaining flesh to do the job;

f.     A hole was bored through the bone and into Ken's sinus cavity beneath his eyes, in order to remove polyps;

g.  Ken's chest was cut open to harvest material to reconstruct the nose he lost in surgery. This material was left as large as a softball so that after chemo shrinkage, the doctors would have something the size of a baseball to form a new nose from;

h.  The skin was stretched and repositioned all around his face to cover the holes adjacent to his nose area that had been bored into his face and bone by the surgery;

i.  After the skin was stretched as described, Ken's eyes would not close and the eyelids had to be rebuilt;

j.  Ken's skull was cut open across the top from ear to ear to harvest material alongside his brain for rebuilding his eyelids;

k.  Ken underwent surgery to rebuild both of his eyelids;

l.  Ken's eyes had to be stitched shut in order to facilitate healing;

m.  A large chunk of skin was partially removed from Ken's forehead and brought down over the bridge of his nose to create a live skin graft to cover a hole into his head beside his nose under his eye.

n.  Ken's reconstructive surgery was largely complete when Chemo opened a tiny pin-hole in the grafted skin alongside his nose.

70.  When the tiny pin-hole opened, Ken's doctor immediately scheduled him for another, final surgery to repair it. This would have been the 15th surgery.

71.  During the period of time that Ken underwent this horrific battery of surgeries he went through an equally difficult battery of emotions. Somewhere in there he determined that he was going to fight the cancer to the end and that he was

going to do it with all the grace and courage he could muster. By the time the final surgery was ready to be scheduled, Ken had moved from a place of almost certain death (5 percent chance to survive) to a place of almost certain recovery (95 percent chance to recover.)

72.     Then Governor Beshear declared a State of Emergency.

73.     Almost immediately thereafter, Governor Beshear closed the hospitals to elective surgeries.

74.     The Hospital canceled Ken's 15th cancer surgery, advising him that the Governor had deemed it a "non-essential" elective surgery. The term was completely devastating to Ken.

75.     In the months that followed, Ken tried repeatedly to see his doctor but he was rebuffed each time and told that his surgery had been deemed a non-essential elective surgery, and that because of Governor Beshear's Executive Orders, there was nothing the hospital could do.

76.     In the ensuing months, the pinhole in Ken's face has grown until it is now larger than it was when the surgeries to repair it first began. In addition, the passage of warm air through the hole next to his eye dries his eye and threatens to permanently damage his eyesight and very possibly render him permanently blind. Ken is able to close the hole with tape but retaining the warm air inside the cavity in his face for any length of time begins to loosen encrusted material which then falls into the back of Ken's throat, causing a serious choking hazard. Throughout the surgeries and chemo, Ken's throat was damaged and lost much of its lining. The

daily choice which Ken must make repeatedly between damaging his vision or risking choking, is exhausting and debilitating.

77.     After making it all the way to his final scheduled surgery, against all odds, Ken is now faced with the specter of another uncertain round of surgeries, with great attendant risks and no certainty of success. He may lose the grafted nose, and the surgeries may fail to repair the now gaping hole, assuming he survives the many surgeries required to address this terrible setback.

78.     Ken has been damaged by the deprivation of his Constitutional Rights. But for the deliberate acts of commission and omission of the Defendants, Ken would have had his fifteenth surgery as scheduled and would have put this horrific chapter of his life behind him already. But for the deliberate acts of commission and omission of the Defendants, Ken would not have suffered the devastating setback described herein. Ken has suffered physical, psychological, emotional and mental harm.

79.     Unfortunately, Plaintiffs' various and several accounts are not unique in Kentucky.  There are many others like them who have suffered unjustly and are afraid to speak out.  By joining in this lawsuit, Plaintiffs are taking a stand for all others similarly situated.

80.     PLAINTIFFS JOHN OR JANE DOES 1-100 are other Kentucky residents who have suffered injuries as a result of the Emergency Mandates, who may join this lawsuit at a later date.

## IV.  THE DEFENDANTS

81.      Defendants are State officials who reside in Kentucky.

82.      Defendant Andrew Graham Beshear ("Governor Beshear") is, and at all relevant times has been, the Governor of the Commonwealth of Kentucky. Defendant Beshear is being sued in his official capacity, and also in his personal capacity.

83.      Defendant Steven J. Stack is, and at all relevant times has been, the Commissioner of the Kentucky Department of Public Health ("KDPH").  Defendant Stack is being sued in his official capacity, and also in his personal capacity.

84.      Defendant Eric C. Friedlander is, and at all relevant times has been, the Secretary of the Kentucky Cabinet for Health and Family Services ("KCHFS"). Defendant Friedlander is being sued in his official capacity, and also in his personal capacity.

85.      Defendants JANE AND JOHN DOES 1-20 are other State Officials and/or Kentucky Residents who may be joined to this Lawsuit at a later date.

## V.  STATEMENT OF FACTS[15]

**A.      Chronology**

**2003**

- CDC publishes Medical Examiners' and Coroners' Handbook on Death Registrations[16] and Fetal Death Reporting and Physicians' Handbook

---

[15] This case intersects science, medicine and associated statistics.  In the interest of an efficient presentation, Plaintiffs have not footnoted or annotated their numerous scientific, medical and statistical references.  Plaintiffs can provide the Court with footnotes and annotations upon request.  Plaintiffs have conducted a thorough investigation, and will present the Court with substantial documentary and live expert testimony at trial.

on Medical Certification of Death. Publications set nationwide standard for collection and reporting of "cause of death" information on death certificates. 2003 guidance is followed today for all diseases, *with the sole exception* of deaths in which COVID-19 is suspected or confirmed. When COVID-19 is suspected or confirmed, the CDC's March 24, 2020 COVID-19 Alert No. 2 is followed instead.

**2020**

- 1/21: Publication of the Corman-Drosten Paper "Detection of 2019 novel coronavirus (2019-nCoV) by real-time RT-PCR" in which researchers claim to have validated the use of PCR testing for SARS-CoV-2 virus.

- 1/21: CDC confirms first known case of COVID-19 in U.S.

- 2/5: CDC releases statement that it does not recommend the wearing of masks among the general public.[17]

- 2/11: WHO reports on its website: "Most people infected with the COVID-19 virus will experience mild to moderate respiratory illness and recover without requiring special treatment. Older people, and those with underlying medical problems like cardiovascular disease, diabetes, chronic respiratory disease, and cancer are more likely to develop serious illness."

- 2/27: U.S. Surgeon General Adams states: "Seriously people- STOP BUYING MASKS! They are NOT effective in preventing the general public from catching #Coronavirus, but if healthcare providers can't get them to care for sick patients, it puts them and our communities at risk!"

- 2/27: Kentucky government officials announce that there are no cases of Covid in Kentucky[18] and that the state will be making efforts to prevent the spread of the virus, including setting up a state covid website: kycovid19.ky.gov.

- 3/5: Governor announces[19] that there are still no cases in the state and warns citizens about COVID-19 scams.

---

[16] *See* https://www.cdc.gov/nchs/data/misc/hb_me.pdf (last visited February 3, 2021).

[17] https://twitter.com/i/status/1225061262800719872

[18] https://kentucky.gov/Pages/Activity-stream.aspx?n=GovernorBeshear&prId=65

[19] https://kentucky.gov/Pages/Activity-stream.aspx?n=GovernorBeshear&prId=75

- 3/6: Governor and state officials confirm first COVID 19 case in Kentucky. Governor declares a state of emergency[20] "to ensure all state entities have the necessary resources to respond." Public Health Commissioner Dr. Steven Stack assured the public that Kentuckians remain at low risk.

- 3/7: The Governor orders activation of the State Health Operations Center[21], announces Kentucky's COVID-19 hotline and formally announces the Kentucky's COVID-19 informational website kycovid19.ky.gov[22].

- 3/7: The Governor issued an executive order to prohibit price gouging, adjusting state government sick leave policy to broaden coverage, urged private businesses to do the same, published CDC guidelines and warnings for high-risk individuals and recommended social distancing.

- 3/9: CDC alerts American citizens over the age of 60 and with pre-existing conditions that they are likely at higher risk of fatality if COVID-19 is contracted.

- 3/9: Kentucky's Governor issues an executive order[23] to waive copays, deductibles, cost-sharing and diagnostic testing fees for private insurance and state employees.

- 3/10: Governor limited visits to long-term care facilities and nursing homes. He also issued an executive order[24] allowing pharmacists to refill prescriptions for up to 30 days, and closing all state parks to visitors. Total cases in Kentucky, six.

- 3/10: Governor Beshear closes all state prisons to visitors.[25]

- 3/11: The Governor cancelled[26] the Governor's Prayer Breakfast, recommended social distancing and the cancellation of community gatherings. He then suspended out-of-state travel for state employees and encouraged businesses to have employees work from home.

---

[20] https://kentucky.gov/Pages/Activity-stream.aspx?n=GovernorBeshear&prId=77
[21] https://kentucky.gov/Pages/Activity-stream.aspx?n=GovernorBeshear&prId=78
[22] \\govfs03\press\kycovid19.ky.gov
[23] https://governor.ky.gov/attachments/20200309_Executive-Order_2020-220.pdf
[24] https://governor.ky.gov/attachments/20200320_Executive-Order_2020-224.pdf
[25] https://chfs.ky.gov/agencies/dph/covid19/guidanceforcorrectionalfacilities.pdf
[26] https://kentucky.gov/Pages/Activity-stream.aspx?n=GovernorBeshear&prId=85

- 3/12: Kentucky authorities recommend that all school districts in the state cease in-person classes for an indefinite period beginning March 16.

- 3/13: Governor Beshear closes senior centers; provides wage replacement benefits to first responders and medical personnel; orders state employee meetings to be held electronically.

- 3/14: Kentucky's first COVID-19 case recovered completely. Case total reaches 18. Childcare centers prepare for closure; hospitals to cease elective procedures. Kentucky's Cabinet for Health and Family services declare a man disabled because he supposedly "refused to self quarantine" and have the local health department appointed as his medical guardian. The Sheriff posts armed guards at the home, imprisoning 6 people against their will.

- 3/16: Governor Beshear issues Executive Order[27] closing Kentucky's restaurants and bars to in person traffic in what purports to, in part, "…ensure that persons and groups disperse from the scene of the emergency…". Within the same paragraph the Commonwealth is designated as the location where the state of emergency supposedly exists. It is ironic that the same EO that devastates a large portion of the restaurant industry in Kentucky purports to have done so in the effort to "…ensure that persons and groups disperse from the scene of the emergency…".

- 3/17: By Executive Order[28] the governor ordered "all public-facing businesses that encourage public congregation or, that by the nature of the service to the public, cannot comply with CDC guidelines concerning social distancing" to close indefinitely. Expressly targeted businesses were entertainment and recreational facilities both public and private, concert, sports, and theater venues, spas, salons, gyms, and other face-to-face service providers. A list of exemptions was included.

- 3/18: Kentucky Executive Order 2020-243[29] reiterates the language of fear, including that the condition, if not contained, threatens to overwhelm the Commonwealth's healthcare resources, and

---

[27] governor.ky.gov\attachments\20200316_Order_Restaurant-Closure.pdf

[28] https://governor.ky.gov/attachments/20200317_Order_Public-Facing-Businesses.pdf

[29] https://governor.ky.gov/attachments/20200318_Executive-Order_2020-243_Social-Distancing.pdf

encourages Kentuckians to comply with CDC social distancing guidelines and orders state agencies, cabinets, boards and commissions to do so and to minimize in-person contact with the public.

- 3/19: Kentucky's Commissioner of Public Health, Dr. Steven J. Stack, and Acting Secretary of the Cabinet for Health and Family Services, Eric Friedlander, claiming authority under the March 6, 2020 E.O. 2020-215 Emergency Declaration, sign an ORDER[30] prohibiting "all mass gatherings," defined as "any event or convening that brings together groups of individuals...," including faith based gatherings, with exemptions and guidelines for implementing the exemptions. This Declaration "delegates" enforcement powers to local health departments.

- 3/20: Governor orders delay[31] in state income tax filing deadline, urges school superintendents to keep the public schools closed to in person instruction. Claims there are 63 confirmed cases of COVID-19 in the state.

- 3/20: Executive Order 2020-245[32], based on the March 6, 2020 E.O. 2020-215 Declaration of Emergency, extends the prohibition against selling goods or services "at a price grossly in excess" of the price for the same product or service when the Emergency was declared on 3/6/2020.

- 3/22: Executive Order 2020-2046[33] continuing to declare that the Commonwealth's medical resources are at risk of being overwhelmed and declaring that places where "people congregate unnecessarily and/or fail to follow adequate social distancing practices are therefore scenes of an emergency"; orders all retail businesses that are not "life-sustaining" closed effective March 23, 2020. The order deemed Warehouse Clubs and Supercenters to be "life-sustaining" while their smaller retail competitors were uniformly "non-essential."

---

[30] https://governor.ky.gov/attachments/20200319_Order_Mass-Gatherings.pdf

[31] https://kentucky.gov/Pages/Activity-stream.aspx?n=GovernorBeshear&prId=99

[32] https://governor.ky.gov/attachments/20200320_Executive-Order_2020-245_PriceGouging.pdf

[33] https://governor.ky.gov/attachments/20200322_Executive-Order_2020-246_Retail.pdf

- 3/23: Kentucky's Cabinet for Health and Family Services (CHFS) issued a directive[34] prohibiting most elective medical procedures in the state; and declaring that authority to issue directives of this type had been delegated to them by Governor Beshear.

- 3/23: Kentucky 'official' case count reaches 124. Governor Beshear announces the establishment of a COVID-19 Reporting Hotline, manned from 7:30 a.m. to 9:00 p.m. by state Labor Cabinet employees, where Kentuckians may inform state authorities of noncompliance with COVID-19 mandates by fellow citizens.

- 3/24: CDC and NVSS issue "COVID-19 Alert No. 2." Alert releases a "newly-introduced ICD code" (U07.1) to "accurately capture mortality data for Coronavirus Disease 2019 (COVID-19) on death certificates." The rule establishes a unique system for collecting and reporting "cause of death" information on individuals who die while purportedly infected with COVID-19. Collecting and reporting "cause of death" information on individuals who die with any other infectious disease continues to be handled under the old rules. The Alert states "COVID-19 should be reported on the death certificate for all decedents where the disease caused **_or is assumed to have caused or contributed_** to death" (emphasis added).

- 3/25: Kentucky Executive Order 2020-257[35] adopts an official public relations slogan, "Healthy at Home" and prohibits "in-person work that is not necessary to protect or sustain life." It orders the closure of all businesses that it deems not to be "life-sustaining" as of March 26, 2020. The Order incorporates its public relations slogan into the key definition for the order. "Life-Sustaining Businesses [initial caps in the original] are those that allow Kentuckians to remain Healthy at Home." Evictions are suspended statewide. Citizens are urged not to be alarmed at the posting National Guard troops and additional law enforcement officers are deployed to hospitals. The fear-inducing rhetoric is repeated regarding the worry that Covid-19 threatens to overwhelm the healthcare system if we do not work together.

- 3/26: Dr. Neil Ferguson, Imperial College London, publishes COVID-19 predictive model incorrectly asserting 2.2 million Americans will die. Model not peer reviewed. Shared with policymakers prior to publication.

---

[34] https://governor.ky.gov/attachments/20200323_Directive_Elective-Procedures.pdf

[35] https://governor.ky.gov/attachments/20200325_Executive-Order_2020-257_Healthy-at-Home.pdf?_sm_au_=iVV3jHMRSnZt11tjJ8MfKK7vWLCsW

- 3/26: Reported Kentucky Covid cases reach 248. The Governor urges county judge-executives to "monitor people gathering in public places" and to "stop them" if they are not following the CDC's recommendations for distancing. The governor does not specify how the county officials are to "stop them." The Reporting Hotline where Kentuckians can inform the authorities about their neighbor's COVID-19 distancing transgressions is expanded with a web site for complaints.

- 3/30:  U.S. Surgeon General Adams states that data does not support healthy people wearing masks in public.

- 3/31:  Kentucky Executive Order 2020-258[36] prohibits travel out of the state for purposes not exempted in the Order, and requires a 14-day self-quarantine when returning from any out-of-state travel for reasons not exempted in the Order. It is noteworthy that this EO specifically states that it is not to be interpreted as an infringement on the Judicial and Legislative branches "performing their constitutional duties or exercising their authority."

- 4/2:  Kentucky Executive Order 2020-266 allows rehiring of retirees and expands E.O. 2020-058's travel restrictions and 14-day self-quarantine on return to non-residents of Kentucky.

- 4/2:  Kentucky Executive Order 2020-267[37] conditionally commutes sentences of 186 non-violent Class C and Class D felons in Kentucky prisons who were considered high risk for Covid-19.

-  4/5:  Governor Beshear recommends voluntary compliance with CDC mask wearing guidelines. Urges Kentuckians, "Do not travel anywhere for any reason." The state ramps up testing to a 2000 per day capacity.

- 4/8:  Kentucky Executive Order 2020-275[38] limits the number of retail shoppers allowed in life-sustaining retail businesses to one individual from each household, and declaring that all prior EO's and Orders issued by the Cabinet remain in full force and effect provided they do not contradict this Order..

---

[36] https://governor.ky.gov/attachments/20200330_Executive-Order_2020-258_Out-of-State-Travel.pdf

[37] https://governor.ky.gov/attachments/20200402_Executive-Order_2020-267_Conditional-Commutation-of-Sentence.pdf

[38] https://governor.ky.gov/attachments/20200408_Executive-Order_2020-275_State-of-Emergency.pdf

- 4/8: The Kentucky Legislature suspended its session from April 8, 2020 through April 13, 2020. The Legislative session adjourned on April 15, 2020. Kentucky's COVID-19 response until the following January was conducted entirely by Executive Order, Health Department Orders and Administrative Regulation.

- 4/10: Following "reports of people ... not practicing good social distancing" on the hiking trails of Kentucky's Natural Bridge and Cumberland Falls State Parks, the governor ordered the parks of the Commonwealth closed.

- 4/12: Kentucky officials announce[39] contracts with private providers to greatly expand COVID testing with the goal of running 20,000 tests in the next five weeks. Increased testing shows results with 1,963 "cases" now confirmed in the state after 25,866 tests were administered. In addition, "Commissioner for the Department for Public Health Dr. Steven Stack publically [sic] announced: "Does our right to gather together entitle us to have other people die as a result? That is essentially, what happened. This is about any gathering, not just churches. We are at a time and place in history when the human species has never faced, for the last hundred years, a threat like we do now. The choices and decisions you make have implications, not only for yourself, but for others.""

- 4/14: CDC adopts the CSTE COVID-19 Position Paper, significantly altering established medical criteria for diagnosis, exclusively for COVID-19; allows for probable diagnoses unconfirmed by lab testing.

- 4/15: Opening of COVID-19 field hospital in Louisville's Exposition Center announced. The facility never accepted patients, and was soon shut down, as were all other Kentucky emergency "field hospitals."

- 4/20: Governor recommends schools stay closed. Kentucky unemployment claims average about 13,000 per day. Labor cabinet employees handled more claims in the 12 days since March 8 than they processed during the entire year of 2019.

- 4/21: Kentucky officials announce the "Healthy at Work"[40] initiative, where specific guidelines are provided for each of a range of businesses effected by Covid-19 Executive Orders. The individual

---

[39] https://kentucky.gov/Pages/Activity-stream.aspx?n=GovernorBeshear&prId=124
[40] https://govstatus.egov.com/ky-healthy-at-work#MinimumRequirements

published guidelines augment the minimum requirements of distancing, masking, sanitizing and health/temperature checks for each type of business.

- 4/23: Testing facilities in Kentucky ran 6,769 Covid tests on this day alone. Total reported case count reaches 3,481. The 4/23 announcement also stated that Kentucky had suffered "191 deaths related to the virus."

- 4/27: Certain elective medical procedures are conditionally relieved[41] from the restrictions imposed by the March 23, 2020 public health directive. The Governor re-emphasized that "every Kentuckian" in any place where 6 feet of social distancing "might be broken" should be wearing a mask.

- 5/3: Governor continues to promote testing. Case total (as reported) reaches 5130.

- 5/10: The University of Kentucky's seven-million-dollar field hospital with 300 beds was de-constructed as ***unused*** and ***unneeded***.[42]

- 5/22: Groups of 10 or fewer people allowed to gather. Kentucky travel ban expires. Kentucky Restaurants are permitted to open at 33% capacity.

- 6/5: Previous Executive Orders allowing pharmacists to renew prescriptions and prohibiting price gouging are extended.

- 7/2: 2000 bed field hospital at Louisville Fairgrounds "mothballed" as unnecessary.[43]

- 7/9: Kentucky Executive Order 2020-586[44], declaring the existence of an ongoing state of emergency, and citing many politicians along with the CDC and KDPH,  makes wearing a face covering in public mandatory with exemptions. Originally issued as a 30-day measure, it has been extended many times. (At this writing in April of 2021, the Governor (in defiance of the Legislature, which revoked his authority to do so) has codified it into Emergency Administrative Regulations,

---

[41] https://kentucky.gov/Pages/Activity-stream.aspx?n=GovernorBeshear&prId=146
[42] https://www.kentucky.com/news/coronavirus/article242671631.html
[43] https://wfpl.org/kentucky-fairgrounds-covid-field-hospital-mothballed/
[44] https://governor.ky.gov/attachments/20200709_Executive-Order_State-of-Emergency.pdf

complete with warrantless arrest powers for law enforcement and criminalizing any failure to "cover the face" in violation of the new Emergency Administrative Regulation).

- 7/14: Total Kentucky Covid tests performed reaches 494,343, total cases are reported as 20,233, or 3.95% of those tested. Officials urge Kentuckians who witness "dangerous non-compliance" to inform upon their neighbors to the authorities through the toll-free hotline or the website.

- 7/16: Kentucky Attorney General Daniel Cameron files a motion to block all of the governor's COVID0-19 orders and restrictions. The motion fails.

- 7/20: The Kentucky Cabinet for Health and Family Services issues a new order reinstating gathering limits to 10 or fewer people from the 50 or fewer stated in the June 29 guidance. People attending weddings, sitting in restaurants, or shopping in big box stores were deemed safe enough to exempt from the stricter requirements.

- 7/20: Kentucky Department of Public Health issues travel advisory recommending 14-day self-quarantine from eight selected states reporting a positive testing rate of 15% or higher.

- 7/27: KYCHFS Order[45] requires all Kentucky bars to close for two weeks, limits restaurants to 25% of pre-Covid indoor capacity, and requests that public and private schools not offer in-person instruction. The stated overriding goal of the Order is to minimize in-person interactions.

- 8/6: Kentucky face mask mandate extended additional 30 days.

- 8/11: KCHFS issues Order allowing bars to open at 50% capacity subject to conditions and mandates a 10:00 p.m. serving curfew and an 11:00 p.m. closing time.

- 8/14: Governor issues Kentucky Executive Order 2020-688[46] declaring affirmatively that "Where people congregate unnecessarily, or fail to follow adequate social distancing practices, **they ARE spreading the disease, creating scenes of an emergency.**" (emphasis added). This EO introduces administrative regulations that

---

[45] https://governor.ky.gov/attachments/20200728_CHFS-Order.pdf
[46] https://governor.ky.gov/attachments/2020.08.14GeneralElection.pdf

greatly eased requirements for voting absentee by mail in the state, including options for doing so without identification.

- 8/21:   The World Health Organization ("WHO") publishes "Coronavirus Disease (COVID-19): Children and masks."  The guidance states that "[c]hildren aged 5 years and under should not be required to wear masks."   The decision whether children aged 6 to 11 should wear masks should be based on the specific circumstances of each child taking into account 6 different factors.  Further, "[t]he use of masks on any children with developmental disorders, disabilities or other specific heath conditions should not be mandatory…"

- 8/26: Governor Beshear and Dr. Stack reject new CDC testing guidelines calling them "reckless" and urging Kentuckians to follow the state's guidelines.

- 9/4:  Updated Executive Orders[47] extend earlier orders concerning evictions, face coverings, and prescription renewals by pharmacists.

- 9/14:  The Kentucky Governor and Commissioner of the Department for Public Health filed an emergency regulation requiring parents to report any positive COVID-19 test their child may have had within 24 hours of having received the test results.

- 9/15: The governor allows bars and restaurants to serve and stay open an extra hour, to 11 p.m. and midnight, respectively.

- 10/6: Kentucky Executive Order 2020-856[48] renews all Executive Orders requiring individuals to wear masks in public and extends them by 30-days. This Order cites to September 16 congressional testimony by the Director of the CDC to declare that: "face masks are the most important powerful public health tool we have" and that there [is] "clear scientific evidence" that face masks are effective in preventing the virus, and that if Americans consistently wore face masks for several weeks "we would bring the pandemic under control".

---

[47] https://governor.ky.gov/attachments/20200904_Executive-Order_2020-751_Evictions_CDC-Order.pdf
[48] https://governor.ky.gov/attachments/20201006_Executive-Order_2020-856_Reneweal_Face-Coverings.pdf

- 11/3: The Governor declares that "Kentuckians should be alarmed"[49] by the surge in COVID-19 cases during the flu season in Kentucky.

- 11/18: Kentucky Executive Order 2020-968[50] declares (again) that scenes of emergency exists where people gather together, and states that **Kentucky is experiencing an exponential and potentially catastrophic surge in Covid-19 cases, that "threatens to overwhelm our healthcare system and cause thousands of preventable deaths."** (emphasis added). This EO places new restrictions on Restaurants and Bars, no indoor service; Social Gatherings, max 8 people from max 2 households; Gyms, Fitness and Recreation Facilities, 33% capacity, no group activity; Venues, Event Spaces and Theaters, limit 25 people per room, weddings and funeral included; Professional Services, close when possible, offer remote service, no more than 33% of staff may be present in open businesses.

- 11/22: Stanford Study is published, stating that masks do nothing to prevent the spread of Covid-19 and that they cause a multitude of psychological, physiological and physical harms, including early death as indicated in the following table from the study.[51]

---

[49] https://kentucky.gov/Pages/Activity-stream.aspx?n=GovernorBeshear&prId=447
[50] https://governor.ky.gov/attachments/20201118_Executive-Order_2020-968_State-of-Emergency.pdf
[51] https://www.sciencedirect.com/science/article/pii/S0306987720333028

**Table 1**
Physiological and Psychological Effects of Wearing Facemask and Their Potential Health Consequences.

| Physiological Effects | Psychological Effect | Health Consequences |
|---|---|---|
| <ul><li>Hypoxemia</li><li>Hypercapnia</li><li>Shortness of breath</li><li>Increase lactate concentration</li><li>Decline in pH levels</li><li>Acidosis</li><li>Toxicity</li><li>Inflammation</li><li>Self-contamination</li><li>Increase in stress hormones level (adrenaline, noradrenaline and cortisol)</li><li>Increased muscle tension</li><li>Immunosuppression</li></ul> | <ul><li>Activation of "fight or flight" stress response</li><li>Chronic stress condition</li><li>Fear</li><li>Mood disturbances</li><li>Insomnia</li><li>Fatigue</li><li>Compromised cognitive performance</li></ul> | <ul><li>Increased predisposition for viral and infection illnesses</li><li>Headaches</li><li>Anxiety</li><li>Depression</li><li>Hypertension</li><li>Cardiovascular disease</li><li>Cancer</li><li>Diabetes</li><li>Alzheimer disease</li><li>Exacerbation of existing conditions and diseases</li><li>Accelerated aging process</li><li>Health deterioration</li><li>Premature mortality</li></ul> |

- 11/27: Consortium of 22 independent scientists publishes external peer review of the Corman-Drosten Paper, identifying 10 fatal technical and scientific flaws, calling for the Paper's retraction, and concluding that the Corman-Drosten protocol that is the basis of PCR testing worldwide has led to "worldwide misdiagnosis of infections attributed to SARS-CoV-2." The peer review concludes that PCR test data from a cycle value of 35 or more is "completely unreliable" and detects only non-infectious (dead) virus. Less than 3% of samples producing positive PCR test results at this level of amplification, when cultured, produce positive cultures. In other words, **97% of positive PCR tests run at an amplification cycle of 35 or more are false positives.** PCR test data from a cycle value of 30 or more is a "grey area" and a positive result cannot be trusted.

- 12/1: CDC guidance continues to sanction PCR testing at up to 40 cycles of amplification.

- 12/7: 19 days after declaring that **Kentucky is experiencing an exponential and potentially catastrophic surge in Covid-19 cases, that "threatens to overwhelm our healthcare system and cause**

**thousands of preventable deaths.",**[52] as a pre-text to continue to devastate small businesses, Governor Beshear declares that "**The end of this virus is out there. We can see it, and we can feel it.**"[53] He further announces that Kentucky is expecting two additional vaccine shipments before the end of the year. In total the state expects at least 38,000 doses of the Pfizer product and 109,000 of the Moderna vaccine this month.

- 12/11:  The U.S. Food and Drug Administration ("FDA") issues the first Emergency Use Authorization ("EUA") for the Pfizer-BioNTech COVID-19 Vaccine, allowing its distribution and use in the United States.

- 12/14: Five Kentucky health care workers are the first to receive injections of the Pfizer Covid-19 Vaccine in the state.

- 12/14: WHO issues an Information Notice warning of false positive COVID-19 tests resulting from PCR tests run at high levels of amplification.  The Notice cautions: "Users of RT-PCR reagents should read the IFU carefully to determine if manual adjustment of the PCR positivity threshold is necessary to account for any background noise which *may lead to a specimen with a high cycle threshold (Ct) value result being interpreted as a positive result. . ..* [W]hen specimens return a high Ct value, it means that many cycles were required to detect virus. In some circumstances, *the distinction between background noise and actual presence of the target virus is difficult to ascertain*" (emphasis added).

- 12/18:  FDA issues its second EUA for the Moderna COVID-19 Vaccine, allowing its distribution and use in the United States.

- 12/22: Top Kentucky government officials and health care workers are first to receive COVID-19 vaccine. As of 12/22 Pfizer and Moderna vaccines have been administered to over 7,300 Kentuckians, mostly health care workers.

**2021**

- 1/7–1/20: Kentucky's PCR test driven statistics on "cases" and "positivity rates" peak at the top of the "flu season" as do deaths

---

[52] https://governor.ky.gov/attachments/20201118_Executive-Order_2020-968_State-of-Emergency.pdf
[53] https://kentucky.gov/Pages/Activity-stream.aspx?n=GovernorBeshear&prId=499

claimed to have been caused by COVID-19. The reported official "positivity rate" begins falling.

- 1/9: Kentucky legislative branch passes Senate Bill One , ending the state of emergency within 30 days of passage.

- 1/13: Legislative session ends.

- 1/19: Governor Beshear vetoes Senate Bill One.

- 1/20: WHO issues a further Information Notice regarding the protocol for COVID-19 tests. The Notice is expected to result in large reductions in the numbers of positive cases.  The Notice calls for the "careful interpretation of weak positive results," reminds clinicians that "[t]he cycle threshold (Ct) needed to detect virus is inversely proportional to the patient's viral load" and calls for the number of cycles used to detect the presence of the virus to be reported along with the test result.

- 1/25:  Kentucky's PCR test driven official "positivity rate" falls below 10%.

- Legislative session begins and the legislative Branch overrides Governor Beshear's veto.

- 2/2: Governor Beshear sues legislative leaders for a restraining order against Kentucky legislative leadership to restrain the enforcement of laws that the legislature passed to limit the governor's emergency powers.  A Kentucky court grants the order.

- 2/12: Officially reported cases and "positivity rates" continue to decline. Governor warns[54] that "even if you've been vaccinated, we have to continue to wear masks and social distance until we defeat this thing once and for all." Governor Beshear declares that health care is a "basic human right" and pledges to continue to address something he calls vaccine equity.

- 2/27:  FDA issues its third EUA for the Janssen / Johnson & Johnson COVID-19 vaccine, allowing its distribution and use in the United States.

---

[54] https://kentucky.gov/Pages/Activity-stream.aspx?n=GovernorBeshear&prId=606

- 2/24: Kentucky positivity rate drops below 6%,[55] . Governor Beshear declares that "they" are getting the vaccines out faster than the federal government can supply them.

- 3/1: Kentucky cases continue to decline, many businesses allowed to open at 60% capacity.

- 3/5: Governor Beshear violates the Separation of Powers Clause contained in the Kentucky Constitution and promulgates Emergency Administrative Regulations, in defiance of the State Legislature which passed legislation limiting his Executive Emergency Authority and declaring that the "state of emergency" no longer exists. (Gov. Beshear vetoed the legislation and the Legislature overrode his veto. A Circuit Judge issued a temporary injunction on the new law, and same is pending appeal).

- 3/9: A record 127,110 Kentuckians receive experimental COVID-19 vaccines in a single week.

- 03/16: Kentucky Legislature passes HR77, ending the so-called Emergency and rolling back certain Executive Orders.

- 3/19: There are now more than a million Kentuckians who have been vaccinated against COVID-19. Nevertheless, Governor Beshear reminds citizens "We still need everyone to continue to mask up, practice social distancing, wash your hands and get vaccinated when it's your turn."

- 03/25: Governor Beshear Vetoes the passage of HR77.

- 03/29: Kentucky Legislature overrides Governor Beshear's veto of HR77.

- 03/30: Governor Beshear moves the Court for a temporary injunction against HR77.

- 3/30: Vaccination rate in Kentucky reaches 40% of the population.

- 4/5: Kentucky teens become eligible to participate in the state's emergency authorized, experimental COIVD-19 gene therapy vaccine trial.

---

[55] https://kentucky.gov/Pages/Activity-stream.aspx?n=GovernorBeshear&prId=631

- Kentucky Court enters a temporary injunction "nunc pro tunc" against HR77, rolling it into the injunction against Senate Bill 1.

- 4/9: Scott Circuit Judge grants injunctive relief to Plaintiff businesses from Governor Beshear's emergency restrictions as it applies to those businesses. In the Order granting injunctive relief Judge Privett takes note that Governor Beshear cannot restrict businesses under color of emergency authority that, once having been granted by the legislature, has been lawfully and constitutionally revoked by the legislature.

- 4/9: KDPH publicizes a lengthy FAQ regarding the various vaccines, declaring them unequivocally to be safe and highly effective.[56]

**B.     There is No Emergency - Even Assuming the Accuracy of COVID-19 "Death" and "Case" Counts**

**(1)     Reported COVID-19 Deaths Fall Far Below the Deaths Projected a Year Ago**

86.     The trajectory of the governmental response to COVID-19 was tragically influenced by a seriously flawed model developed by Neil Ferguson of the Imperial College of London, which predicted 2.2 million deaths from COVID-19 in the United States (there have been 504,803 according to the CDC), and tens of millions of deaths worldwide (there have been 2,604,373, according to Johns Hopkins University).   The model was cited by the WHO.   The report compared COVID-19 to the Spanish flu, which killed approximately 50 million people in 1918. Ferguson's report stated that the only way to prevent massive deaths would be for the entire population of the planet to be locked down and for people to remain separated for 18 months until a vaccine was available. On the basis of Ferguson's report, the World Health Organization, which had previously stated that lockdowns

---

[56] https://chfs.ky.gov/agencies/dph/covid19/Cv19VaccineFAskedQ.pdf

were not effective for containing infectious diseases, recommended that the world follow China's example, which included mandatory lockdowns and contact tracing.

87.     That Ferguson's projections could be so flawed is not surprising, given his past work.  In 2002, he predicted that 150,000 people would die from Mad Cow Disease, but only 2,704 died – an estimation 55 times higher than the real number. A few years later he predicted that 65,000 people would die of swine flu, and only 457 people died – an estimation that was 142 times higher than the real number. He predicted 200,000,000 deaths from bird flu, and only 455 people died – a prediction 439,560 times higher than the real number.

88.     Tom Frieden, the Director of the CDC under President Obama, was more conservative, but still wrong, when estimating in early March of this year that a figure of 1,000,000 U.S. deaths was plausible.  The media jumped on the bandwagon of dire predictions and spread fear throughout the population. These predictions initially influenced public policy to a considerable degree in the United States, including here at home in Kentucky, but we now know that they were wrong.

89.     The Kentucky Team reports that COVID-19 has killed less than .12% of the State's population. This figure alone establishes that there is no justification for the Emergency and the Emergency Mandates.

### (2)     COVID-19 Does Not Threaten the Entire Population - Fatalities Are Limited to a Definable Age Demographic

90.     *From the very beginning*, it has been clear that COVID-19 affects the elderly disproportionately, subjecting them to the highest risks of infection if exposed, hospitalization and death.  A March 30, 2020 study published in the

respected U.K. medical journal the <u>Lancet</u> showed a dramatic difference in case fatality rates by age group, estimating a 0.63% average rate for all those under 60 years old, and a 6% average rate for those over 60 years old.  Data from China, Europe and the WHO released even earlier in 2020 pointed to the same conclusion.

91.    In fact, in Kentucky, fully 93% of all deaths attributed to COVID-19 have occurred in the 60-and-over age group, and 75% of all deaths attributed to COVID-19 have occurred in the 70-and-over age group. More than 80% of the State's population is not included in that demographic. Only two people under the age of 20 have died (tragically) of COVID-19 in Kentucky, according to the state's statistics, which themselves are questionable in light of the special rules relating to cause of death that have been promulgated in violation of federal statute, and which are detailed and challenged below.  Approximately 75% of all Kentuckians who are 70 or over and who the state declares contracted COVID-19, have survived it.[57].

92.    Based on this data, the Defendants could have crafted far less burdensome mandates designed specifically to protect this most vulnerable age demographic, rather than attempting to protect 100% of the population.  Data available in early March 2020 could have been used by State decision-makers to support a narrowly tailored strategy of containment for the segment of the population most at risk, without causing profound disruptions to the entire economy and all of Kentucky's residents regardless of their risk profile.

93.    The irrationality of the State's response is nowhere more evident than in its approach to the elderly in the State's nursing homes.  As of September 2020,

---

[57] https://www.wcpo.com/news/coronavirus/live-beshear-gives-kentucky-covid-19-update-march-31 (last viewed on April 1, 2021).

Eight of Kentucky's nursing homes accounted for nearly one third of the Industry deaths. Those homes all had one thing in common. They had comparatively few registered nurses. While the national average was around 45 minutes of RN staff time per resident per day, these eight homes were averaging 24 minutes and one was averaging just 12 minutes per day.[58] These problems with understaffing were not unknown to Team Kentucky, and measures could have been taken to shore up that staffing needs of our most vulnerable.

94.     Instead of narrowly tailoring their interventions, the State's officials deployed countermeasures applicable to the entire population, including extreme lockdown policies, massive governmental intrusions into our daily lives, and maximal invasions of our constitutional freedoms.

### (3)   COVID-19 Kills Fewer People than other Causes of Death, for Which No Emergency Has Been or Will Be Declared

95.     COVID-19 lags far behind heart disease, cancer, accidents, chronic lower respiratory disease, stroke, Alzheimer's disease, drug overdose and diabetes as a cause of death in Kentucky,[59] and these are all conditions for which no emergency has been or ever will be declared.:

**Deaths by Cause in Kentucky, 2019**

| Cause of Death | Rate per 100,000 |
| --- | --- |
| Heart Disease | 195.9 |
| Cancer | 185.7 |
| Chronic Lower Respiratory | 64.5 |

---

[58] https://www.kentucky.com/news/coronavirus/article245550700.html

[59] Most recent leading causes of death in Kentucky from the CDC can be viewed here: https://www.cdc.gov/nchs/pressroom/states/kentucky/kentucky.htm . CDC reporting on the 12 month Covid-19 death rate can be viewed here: https://www.cdc.gov/nchs/pressroom/states/kentucky/ky.htm .

| Accidents | 72.9 |
|---|---|
| Stroke | 39.4 |
| Drug Overdose | 32.5 |
| Diabetes | 27.7 |
| **COVID-19 (12 month rate)** | **23.1** |

96.     The federal CDC reports that nationwide there have been 503,052 COVID-19 deaths, representing 0.15% of the population.  Even if we were to assume *arguendo* that Kentucky's COVID-19 death per population rate will increase to the national level, it remains less than other leading causes of death in the State for which no emergency has been (or will be) declared.

### (4)     COVID-19 Has Not Overwhelmed Healthcare Capacity

97.     In March and April of 2020, the Defendants told us that our constitutional freedoms had to be taken away from us so that we could "flatten the curve" of COVID-19 cases.  This was a reference to a federal CDC model that predicted a tremendous surge in the need for hospitalization around the country due to COVID-19 that would overrun our healthcare infrastructure.  That model, like so many others that were the basis for public health policy nationally and in the State, was wildly exaggerated.  The federal government spent at least $660 million constructing field hospitals around the country, but most of them never treated a single patient and were dismantled.  The University of Kentucky's seven-million-dollar field hospital with 300 beds was de-constructed as **unused** and **unneeded** in early **May of 2020**.[60]  Less than 2 months later on July 02, the 2,000 bed field hospital in Louisville was "mothballed" as not needed, nevertheless Governor

---

[60] https://www.kentucky.com/news/coronavirus/article242671631.html

Beshear and the Ky Team continued to deliberately and relentlessly push the fear based narrative that our medical facilities are at risk of being overrun.

### (5)     Multiple COVID-19 Vaccines are Now Deployed

98.     The FDA has issued Emergency Use Authorizations for COVID-19 vaccines produced by three different manufacturers – Janssen, Moderna and Pfizer-BioNTech, and they are circulating in the population. Federal CDC data indicates that since vaccine distribution began in the United States on December 14, 2020, more than 90 million doses have been administered to 17.7% of the population.  KDPH data indicates that as of April 25, 2021, 1,723,624 unique Kentuckians have received a first dose of vaccine.  As of March 30, 2021, KDPH declared that 40% of the population of Kentucky had been vaccinated.

### (6)     The Population Has Reached or Is Fast Approaching Herd Immunity

99.     Dr. Marty Makary, a Professor from Johns Hopkins' Bloomberg School of Public Health, has projected that stated that COVID-19 will disappear in the United States by April 2021 due to herd immunity, which he says is the "inevitable result of viral spread and vaccination."  COVID-19 "cases" are down 77% over the past 6 weeks nationally, which he attributes to "natural immunity from prior infection." He explains: "Testing has been capturing only from 10% to 25% of infections, depending on when during the pandemic someone got the virus. Applying a time-weighted case capture average of 1 in 6.5 to the cumulative 28 million confirmed cases would mean about 55% of Americans have natural immunity."    Another 18% of the population has been vaccinated. If 73% of

Americans are already immune, why is Kentucky still suffering in the legal construct of this Emergency?

### C.   There is No Emergency - the COVID-19 "Death" and "Case" Counts are Inflated

100.   The preceding section of this Complaint assumes the accuracy of the COVID-19 "death" and "case" data upon which the Defendants have based their Emergency Mandates. ***In this section, Plaintiffs challenge the accuracy of the data upon which the Declaration of Emergency is predicated***.

### (1)   NVSS Coding Instructions Unique to Death Certificates for Individuals Testing Positive for COVID-19 Result in Over-Reporting of Deaths Caused by COVID-19

101.   For the past 17 years, all infectious diseases and causes of death have been categorized based on the federal CDC's Medical Examiners' & Coroners' Handbook on Death Registration and Fetal Death Reporting and the federal CDC's Physicians' Handbook on Medical Certification of Death. These documents instruct coroners and physicians to differentiate between (i) immediate cause of death, (ii) underlying cause of death, and (iii) any other illness, condition, or injury that contributed to but did not cause the underlying cause of death. The Coroners' Handbook states:

> For statistical and research purposes, it is important that the causes of death and, in particular, the underlying cause of death, be reported as specifically and as precisely as possible. Careful reporting results in statistics for both underlying and multiple causes of death (i.e., all conditions mentioned on a death certificate) reflecting the best medical opinion.

102.   On March 24, 2020 the National Vital Statistics System ("NVSS") introduced a new International Classification of Disease ("ICD") code for

Coronavirus Disease 2019 (U07.1) to "accurately capture mortality data for Coronavirus Disease 2019 (COVID-19) on death certificates." Instead of differentiating between primary and underlying causes of death, the new coding instruction lumps the two together, and instructs coroners and physicians to report as COVID-19 deaths any death where the disease caused "***or is assumed to have caused or contributed to death***" (emphasis added).

103. This is not an academic concern. The federal CDC's own data regarding co-morbidities shows that "[f]or 6% of [COVID-19] deaths, COVID-19 was the only cause mentioned. For [COVID-19] deaths with conditions or causes other than COVID-19, on average, there were 2.6 additional conditions or causes of death." Public health officials across the United States have stated that they consider anyone who died with a positive PCR test to have died from COVID-19, and are counting accordingly. If 6% of the COVID-19 deaths reported by the KDPH is a more accurate count, then the true number of COVID-19 deaths in Kentucky as of this writing is much lower than the .12% noted above. The Kentucky Team admits that under its death count rules "***[i]t is not necessary that COVID-19 be the primary cause of death***" (emphasis added).

104. Dr. Genevieve Briand of John Hopkins University published a study demonstrating that the overall death rate in the United States has remained the same, despite the deaths attributed to COVID-19. Dr. Briand analyzed federal CDC data for 2018 and 2020, and found that nationwide deaths from causes other than COVID-19, decreased by the same amount that COVID-19 deaths increased. There are no excess deaths due to COVID-19.

### (2)    The PCR Test for COVID-19 is Seriously Flawed and Results in False Positive Results at High Cycles

105.    Of all forms of testing for infection with the SARS-Cov-2 virus, the laboratory PCR test dominates in Kentucky.  90% of all testing in Kentucky is PCR testing.[61]

106.    The PCR test works as follows. The test requires a sample of mucus from a person's nose or throat or sputum (and more recently, PCR tests using saliva have been introduced), then uses that sample to search for viral RNA, which is a fragment of genetic material belonging to a virus.   RNA is then converted to DNA through a process called reverse transcription, which is then amplified many times to make it detectable, through a process called polymerase chain reaction, or PCR. The PCR process of amplification involves creating copies of the viral DNA and is done in cycles, and cycles can be repeated until there are as many as one billion copies of the original viral fragment.  The number of times a cycle is repeated is called the "Ct value."  In most of the United States' lab settings, the cycle is repeated at least 35-40 times before a specimen is declared "negative," or devoid of viral material, although the WHO initially established a standard cycle threshold limit of 45 cycles.

107.    Hundreds of companies are currently producing PCR tests for detecting viral RNA claimed to be from SARS-CoV-2.  These tests were approved by the FDA under Emergency Use Authorization (EUA) without an established reference method, but rather testing the tests against other EUA approved tests to

---

[61] https://wfpl.org/why-kentucky-is-changing-some-covid-19-data-the-positivity-rate-explained/

establish an acceptable degree of performance. This process involved testing specimens from people who the researchers already knew had COVID-19. This results in significant bias.  Without control groups of blinded testing, it is impossible to determine the magnitude of the inaccuracy of a given test.

108.    There are other issues with the PCR tests. One is that the viral RNA detected by the test is likely to remain in a person for up to 3 months after the infectious period has passed.  This means the tests are useless for determining who should be quarantined as they do not differentiate between active virus vs. inactive or dead virus from a previous infection or exposure that was effectively controlled by the body's immune system. Another is the risk of cross-contamination, of collected specimens or reagents (chemical components of the test), from improper handling, in the laboratory or when collecting specimens from large numbers of people in crowded settings.    Even the tiniest amount of cross-contamination can lead to a false positive result, which means people who have never been exposed to COVID-19 could be subjected to unwarranted quarantines.

109.    Aside from the issue of accuracy, there is the issue of suitability of the PCR test as a diagnostic tool. The inventor of the PCR test, Kary Mullis, Ph.D., who won a Nobel Prize in chemistry for the invention in 1993, developed the test as a tool for use in laboratory research, but said that the test was never designed to diagnose disease.   That is because, while COVID-19 PCR tests identify the presence of viral fragments in DNA, the tests do not provide accurate information about the presence of infectious, live virus as opposed to non-infectious (dead) viral fragments.  The federal CDC apparently agrees.  The July 2020 instruction manual

for its 2019-Novel Coronavirus (2019-nCoV) Real Time RT-PCR Diagnostic Panel test includes these statements: "***Detection of viral RNA may not indicate the presence of infectious virus or that 2019-nCoV is the causative agent for clinical symptoms***" (emphasis added); and "This test cannot rule out diseases caused by other bacterial or viral pathogens."

110.    In addition, it appears that PCR test development took place in the absence of an isolated SARS-CoV-2 virus, the virus alleged to cause COVID-19.  From the final paragraph of the foregoing instruction manual:

> Since no quantified virus isolates of the 2019-nCoV are currently available, assays designed for detection of the 2019-nCoV RNA were tested with characterized stocks of in vitro transcribed full length RNA (N gene; GenBank accession: MN908947.2) of known titer (RNA copies/µL) spiked into a diluent consisting of a suspension of human A549 cells and viral transport medium (VTM) to mimic clinical specimen.

111.    In January 2020, a group of scientists authored the Corman-Drosten Paper, in which they claimed to have validated the use of PCR testing for the SARS-CoV-2 virus.  This Paper was relied upon worldwide to promote the use of PCR testing.  And yet it discloses: "We aimed to *develop* and deploy robust diagnostic methodology for use in public health laboratory settings without having virus material available."  The scientists claimed to have established a methodology for using the PCR test to identify the SARS-CoV-2 virus using "theoretical genetic sequences" of a "closely related" virus.

112.    In November 2020, an international consortium of scientists conducted an external peer review of the Corman-Drosten Paper, identified 10 fatal defects in the Paper, and called for its retraction. Obviously, the most serious of the flaws was the fact that it is impossible to develop a valid test without actual viral

material, and the use of viral material referred to as "closely related" is not a proper substitute. "Theoretical genetic sequencing" means bits of genetic material fed into a computer to guess at the remaining sequence. In other words, it is made up.  In plain English, it would appear that there were no available pure SARS-CoV-2 isolates to test against, so instead an educated best guess was used. How accurate can a test for a virus causing COVID-19 be, when that virus has not been isolated?  Also, as stated elsewhere, it was determined that the test could not distinguish between whole live virus and dead viral fragments.  The federal CDC has admitted that "[r]ecovered adults can continue to shed detectable but non-infectious SARS-CoV-2 RNA in upper respiratory specimens for up to 3 months after illness onset."  Further, the Corman-Drosten scientists failed to establish a "Ct value" at which a sample is considered positive and negative.

113.    There is yet another problem with the use of the PCR test as a diagnostic test.  PCR tests have been shown to produce a highly elevated rate of "false positive" results in people who are likely not infectious, especially in asymptomatic (healthy) people.  This is a by-product of the PCR process, in which a viral genetic fragment is amplified in cycles.  Each amplification cycle is a doubling, so it is exponential. This means that an amplification factor of 40 is 1 x 2 to the 40th power, or more than a trillion times amplification.  As explained in a review of PCR tests, published by the *Society of Critical Care Medicine*:

> Through the use of fluorescent probes and detection steps between replication cycles, the test allows quantification of the amount of viral RNA (viral load) in a sample. As DNA is replicated exponentially during PCR, the fluorescence also increases exponentially. The [testing] instrument reports a Ct (cycle threshold), which is the number of replication cycles that are required to produce a fluorescent signal that exceeds a baseline. Samples that

contain a large starting amount of viral RNA require fewer cycles to produce a detectable fluorescent signal (and therefore have a lower Ct). The Ct has a simple negative linear correlation with the logarithm of the number of viral copies in the original sample. This relationship quantifies the amount of viral RNA in a specimen; however, the assays [tests] must then include additional standards containing known concentrations of viral RNA.

114.    There are three important things to note in this description. One is reference to a "baseline," a point at which viral RNA presence is deemed significant, which is determined by each test manufacturer, not a standard established by a centralized public health authority like the FDA.  Another is that in order to quantify the amount of virus in a specimen, the test must compare the resultant "Ct value" to "some known concentration of RNA." It is not known if the tests do this but our research has indicates that the test result is simply a binary.

115.    The third important point is that "the Ct has a simple negative linear correlation with the logarithm of the number of viral copies in the original sample." The number of cycles at which viral fragment is detected varies with the viral load, or the amount of virus, that an individual is carrying.  So individuals who "test positive" at a higher cycle threshold have a lighter viral load, and are therefore not likely to be infectious.  Current practice is to report test results as binary results, "positive" or "negative," with no reference to "Ct value," and therefore with no consideration of how much of a viral load a person may carry or how infectious they may or may not be, grossly inflating the number of people who pose a risk to others. Also, without any standardized guidance from the FDA, the number of cycles at which a test result is deemed "positive" or "negative" varies from lab to lab, test to test.  As a result, healthy people who are not infectious are being unnecessarily

subjected to self-isolation, quarantine, and/or contract tracing, and their places of employment can be shut down.

116.   In September 2020, the *Journal of Clinical Infectious Diseases* published scientific research supported by a grant from the French government, in which scientists performed 250,566 COVID-19 PCR tests on 179,151 patients and found that 13,161 were positive. They selected 3,790 "positive" samples and attempted to grow a virus in a culture medium.  They were only successful in growing a virus in about half of the samples.  For those samples, in which the "Ct value" was 25 cycles for a positive test, 70% grew a virus.  But when the "Ct value" was 35 cycles, only 3% of the samples grew a virus.  This is important since many of the PCR tests granted Emergency Use Authorization by the FDA use a "Ct value" of 35-45 cycles or higher when testing for COVID-19, and at these cycles we can expect a false-positive rate as high as 97% based on the French study.  The study concludes that positive test results at Ct values over 30 should not be used to guide public health decisions.  Many other experts agree with this.  Even Dr. Fauci is aware that PCR is useless and unreliable for diagnosing COVID-19 when run at 35 cycles or higher:

> What is now evolving into a bit of a standard is that if you get a cycle threshold of 35 or more that the chances of it being replication competent are miniscule…We have patients, and it is very frustrating for the patients as well as for the physicians…somebody comes in and they repeat their PCR and it's like 37 cycle threshold…you can almost never culture virus from a 37 threshold cycle. So I think if somebody does come in with 37, 38, even 36, you gotta say, you know, it's dead nucleotides, period." In other words, it is not a COVID-19 infection.

117.   The chart below sets forth the manufacturer's recommended cycle threshold for 5 commonly used PCR tests:

| Manufacturer | Manufacturer's Recommended Cycle Threshold |
|---|---|
| CDC 2019-Novel Coronavirus Real Time (RT-PCR Diagnostic Panel) | 40 cycles |
| SARS-CoV-2 Test Kit (Real-time PCR) | 45 cycles |
| Opti Sars CoV-2 RT-PCR Test | 45 cycles |
| Wren Labs COVID-19 PCR Test | 38 cycles |
| LabCorp COVID-19 RT-PCR | 35 cycles |

Scientific studies and statements of the WHO indicate that PCR tests run at these high threshold level are perfectly useless for the purpose of diagnosing COVID-19.

118.    It is worth noting that these test manufacturers will continue selling tests only as long as the "crisis" continues.  Once it ends, sales and profits drop. They are incentivized to find cases and do not even have to report how they determine a case exists, in that they do not have to report "Ct values."  Dr. Fauci has stated that when someone has a positive test, "...they don't give them the cycle threshold unless they go back and ask for it."

119.    The WHO has issued two Information Notices cautioning public health officials about the risk of false positive results when PCR tests are run at high cycles. In December 2020, it issued a notice stating:

> Users of RT-PCR reagents should read the IFU carefully to determine if manual adjustment of the PCR positivity threshold is necessary to account for any background noise which ***may lead to a specimen with a high cycle threshold (Ct) value result being interpreted as a positive result. . ..*** [W]hen specimens return a high Ct value, it means that many cycles were required to detect virus. In some circumstances, ***the distinction between background noise and actual presence of the target virus is difficult to ascertain*** (emphasis added).

120.    In January 2021, the WHO issued a further notice counseling the necessity of "careful interpretation of weak positive results," reminding clinicians

that "[t]he cycle threshold (Ct) needed to detect virus is inversely proportional to the patient's viral load" and calling for the number of cycles used to detect the presence of the virus to be reported along with the test result.

121.    On April 16, 2021, the CDC declared that they will not accept or process any patient sample with a PCR above a CT value of 28 for suspected Vaccine Breakthrough cases, which is as much as an admission that they do not trust the results of a higher CT Value, when it involves numbers that they are not interested in inflating.[62] It seems the cycle thresholds can be "adjusted" as desired by the CDC to suit their ends. This approach is antithetical to science and should demonstrate to this Court that the people of the Commonwealth of Kentucky and of this great Nation have been "had". The numbers pushed dramatically and relentlessly by the Defendants to frighten and intimidate the residents of Kentucky into belief in an emergency that does not exist, and into surrendering their fundamental God-given Liberties without any due process, are arbitrary and adjustable and entirely untrustworthy.

122.    If the PCR test error rate were only 5%, that would mean that the number of cases worldwide is off by millions.   But the error rate has been shown to be much higher, which means the world's population is suffering under unprecedented lockdowns due to a fabricated pandemic.

> **(3)    Kentucky's "Case" Count is Inflated by Inclusion of "Probable Cases"**

---

[62] https://www.cdc.gov/vaccines/covid-19/health-departments/breakthrough-cases.html

123.    Kentucky defines a "probable case" so broadly, that any number of different ailments could be included.  An individual who has any one of the following symptoms will be reported as a probable case: cough, shortness of breath, difficulty breathing, or new loss of taste or smell.  An individual who has at least 2 of the following symptoms will be reported to the public will be reported as a probable case:  fever, chills, repeated shaking with chills, muscle pain, headache, sore throat, nausea, vomiting, diarrhea, fatigue, congestion or runny nose.

### (4)    The "Case" Count is Subject to Perverse Financial Incentives

124.    As previously noted, manufacturers of the PCR test benefit if the "crisis" continues, and the crisis continues if the State uses PCR tests employing cycles above 30 to determine "cases."

125.    It is also critical to note the financial incentive to include deaths as COVID-19 deaths.  In Kentucky, according to Becker's Hospital Review, hospitals are being reimbursed an additional $297,000 per COVID-19 case[63], and a death from COVID-19 can qualify as a "case" without a lab test. Only seven other states receive more federal dollars per Covid-19 case.  COVID coding on a death certificate is evidence of a probable case and can result in an additional 20% hospital reimbursement from Medicare under provisions of the federal CARES legislation. CDC Director Robert Redfield acknowledged this perverse financial incentive in sworn Congressional testimony on COVID-19: "I think you're correct in that we've seen this in other disease processes too, really in the HIV epidemic, somebody may

---

[63] https://www.beckershospitalreview.com/finance/state-by-state-breakdown-of-federal-aid-per-covid-19-case.html?utm_campaign=bhr&utm_source=website&utm_content=related

have a heart attack, but also have HIV – the hospital would prefer the classification for HIV because there's greater reimbursement."

126.   The number reported as "total cases" is extremely misleading for most people who assume that this figure reflects the actual number of persons who are *currently* "infected" and therefore "infectious", or who, by symptoms, have been diagnosed as having COVID-19.

127.   The public has been brainwashed to believe that a "case" is an infectious person walking among the public, a dangerous "silent spreader" of a virus. The Defendants have repeatedly made written and codified declarations to the effect that anyone in public who is failing to social distance at any given moment is creating a "local state of emergency" at the moment that they encroach within 6 feet of another human.

128.   The public is being misled by the fear-inducing, ever-increasing, cumulative case count that is constantly and verbally projected at them, believing that these numbers demonstrate a serious state of emergency. It is no wonder that so many people are living in extreme panic and hysteria over this disease.

129.   In sum, these "case" and "death" counts, based on uniquely altered and relaxed rules for death certificate reporting, faulty PCR testing, and "probable case" counts, are grossly inflated and completely unreliable. They are subject to perverse financial incentives. They are broadcast relentlessly to the public and used to justify and fashion Emergency Mandates. Those Emergency Mandates have robbed the people of the State of their precious freedoms, and they are enforceable

with criminal prosecution, imprisonment and fines. Where is the limit of judicial deference, in these circumstances?

130.   We remind the Court that under 18 U.S.C. 47 Section 1040 criminal fraud in connection with major disaster or emergency benefits is defined as:

> (a)   Whoever, in a circumstance described in subsection (b) of this section, knowingly—
>
> (1) falsifies, conceals, or covers up by any trick, scheme, or device any material fact; or
>
> (2) makes any materially false, fictitious, or fraudulent statement or representation, or makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or representation, in any matter involving any benefit authorized, transported, transmitted, transferred, disbursed, or paid in connection with a major disaster declaration under section 401 of the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. 5170) or an emergency declaration under section 501 of the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. 5191), or in connection with any procurement of property or services related to any emergency or major disaster declaration as a prime contractor with the United States or as a subcontractor or supplier on a contract in which there is a prime contract with the United States, shall be fined under this title, imprisoned not more than 30 years, or both.

131.   We believe that this Section is relevant to many of the medical centers that are promoting this false narrative and profiting from doing so. We further remind the Court that an act of fraud is outside the scope of the authority of the various office holders in a number of State agencies. While the Plaintiffs do not suppose themselves to be in a position to prosecute such fraud the facts seem to suggest that the State of Kentucky and many others would have known that this

disease is far less dangerous than it has been shown to be and that it knowingly concealed and covered up relevant data.

### D. The Defendants' COVID-19 Mandates Are Ineffectual, and Unsupported by Science or Medicine

#### (1) The Fallacy of Asymptomatic Spread

132. The designation of healthy people as a "case" which represents an "infection" is part of the "asymptomatic spread" argument, which the state uses to justify isolating everyone, throwing them out of work, closing businesses, and destroying the learning and social lives of children in the name of public safety. But there is *no credible scientific evidence* that demonstrates that the phenomenon of "asymptomatic spread" is real. To the contrary, on June 7, 2020, Dr. Maria Von Kerkhov, head of the WHO's Emerging Diseases and Zoonosis Unit, told a press conference that from the known research, asymptomatic spread was "very rare." "From the date we have, it still seems to be rare that an asyptomatic person actually transmits onward to a secondary individual." She added for emphasis: "it's very rare." Researchers from Southern Medical University in Guangzhou, China, published a study in August 2020 concluding that asymptomatic transmission of COVID-19 is *almost non-existent*. "Asymptomatic cases were least likely to infect their close contacts," the researchers found. A more recent study involving nearly 10 million residents of Wuhan, China found that there were no, zero, positive COVID-19 tests amongst 1,174 *close contacts* of asymptomatic cases, *indicating the complete absence of asymptomatic transmission*.

#### (2) The Futility of Masking

133.    The Emergency Administrative Regulation[64] requires face coverings on all persons, even those as young as 2, and even those with disabilities, to wear masks in any outdoor or indoor public setting, or while using public transportation. This draconian age limit contradicts WHO guidance that "[c]hildren 5 years and younger should not be required to wear masks.  This is based on the safety and overall interest of the child and the capacity to appropriately use a mask with minimal assistance. ...the decision to use masks for children aged 6-11 should be based on ...[p]otential impact of wearing mask on learning and psychosocial development, in consultation with teachers, parents/caregivers and/or medical providers." Kentuckians with disabilities must wear masks, unless the mask cannot be "safely" worn because of the disability. "Safely" is such an ambiguous term in this context that it essentially neuters and makes token the exemption. Kentuckians who cannot wear masks are currently cut-off from essential services, such as in-person doctor's visits, public education and grocery shopping.  This discrimination is being encouraged by the Defendants, who have made violations of the requirements to "cover the face" punishable as a Class A Misdemeanor, subject to arrest on the spot; who will fine businesses lax in their enforcement as little as $25 but have full discretion to arbitrarily decide, instead of a fine, to shut the entire business down; and who openly solicit "snitching."

134.    Those who insist that mask-wearing has been proven to be effective in slowing or stopping the spread of COVID-19 and is universally recommended according to the "science" are propagating false and misleading information.  The

---

[64] https://apps.legislature.ky.gov/law/kar/902/002/211E.pdf

federal CDC has admitted: "There is no scientific evidence for healthy people wearing masks." A September 2020 federal CDC study of confirmed COVD-19, symptomatic adults treated in academic outpatient clinics revealed that people who report wearing masks "always" or "often" are at 18 times the risk of developing COVID-19, compared to those who report wearing them "never" or "rarely."

135.    On April 01, 2021, two highly qualified experts in respiratory protection from the University of Illinois at Chicago, Dr. Brousseau[65] and Dr. Sietsema,[66] published a Commentary for CIDRAP (the Center for Infectious Disease Research and Policy) entitled: **Masks-for-all for Covid-19 not based on sound data**.[67] Dr.'s Brousseau and Sietsema concluded the following:

> "**Cloth masks are ineffective as source control and PPE**, surgical masks have some role to play in preventing emissions from infected patients, and respirators are the best choice for protecting healthcare and other frontline workers, but not recommended for source control. **These recommendations apply to pandemic and non-pandemic situations**." (*emphasis added*)

136.    The results of the first randomized controlled trial evaluating the effectiveness of face masks against SARS-CoV-2 were published in November 2020. Danish scientists and physicians studied 6000 individuals at the University of

---

[65] Dr. Brosseau is a national expert on respiratory protection and infectious diseases and professor (retired), University of Illinois at Chicago,  an Industrial Hygienist certified by the American Board of Industrial Hygiene and Associate Faculty of Occupational Hygiene in the British Occupational Hygiene Society with a focus on respiratory protection, aerosol measurement, filtration performance, and small business health and safety, and a Research Consultant, University of Minnesota, Center for Infectious Disease Research and Policy

[66] Dr. Sietsema is an assistant professor of environmental and occupational health sciences at the UIC School of Public Health whose expertise and research focuses on respiratory protection.

[67] https://www.cidrap.umn.edu/news-perspective/2020/04/commentary-masks-all-covid-19-not-based-sound-data

Copenhagen and concluded that wearing a high-quality surgical mask "did not reduce, at conventional levels of statistical significance, incident SARS-CoV-2 infection."   Among the study subjects who wore masks, 1.8% tested positive for SARS-CoV-2, compared to 2.1% among the control group.

137.   A study of tightly controlled U.S. Marine Corps recruits published in the New England Journal of Medicine in November 2020 came to the same conclusion.  2% of a group of 1,848 recruits tested positive for SARS-CoV-2, in spite of mandatory masking at all times, daily cleaning of rooms, sanitizing bathrooms with bleach wipes, maintaining 6 feet of distance, never leaving campus, avoiding items that might lead to surface-based transmission, and eating pre-plated meals. Economist Brian Westbury assembled data from the COVID Tracking Project and YouGov.org showing that daily positive SARS-CoV-2 tests rose and fell precipitously despite mask-wearing being sustained continuously at 80%. Epidemiologists have noted that SARS-CoV-2 "is following the predictable bell-shaped pattern of epidemics predicted by Farr's law in 1840, regardless of mitigation efforts."

138.   The U.S. Surgeon General has stated: "Seriously people - STOP BUYING MASKS! They are NOT effective in preventing general public from catching #Coronavirus, but if healthcare providers can't get them to care for sick patients, it puts them and our communities at risk!"   And on another occasion he said: "Masks are not effective in preventing the general public from catching coronavirus."   NIAID Director Dr. Fauci has said: "People should not be walking around wearing masks. Masks do not provide the protection people think they do."   He also said: "When you are in the middle of an outbreak, wearing a mask might make people feel a bit

better, and it might even block a droplet. But it is not providing the perfect protection that people think it is, and often there are unintended consequences…" The FDA has said: "Even a properly fitted N95 mask does not prevent illness or death." The California Department of Health has said: "There is limited evidence to suggest that use of cloth face coverings during a pandemic could help reduce disease transmission."

139.   The WHO "acknowledges that we lack evidence that wearing a mask protects healthy persons from SARS-CoV-2." The WHO's "Advice on the Use of Masks in the Context of COVID-19" states that "[a]t present, there is no direct evidence (from studies on COVID-19 and in healthy people in the community) on the effectiveness of universal masking of healthy people in the community to prevent infection with respiratory viruses, including COVID-19." The WHO also stated: "the widespread use of masks by healthy people in the community setting is not yet supported by high quality or direct scientific evidence and there are potential benefits and harms to consider." Dr. Mike Ryan, Executive Director of the WHO's Health Emergencies Program, has stated: "There is no specific evidence to suggest that the wearing of masks by the mass population has any potential benefit. In fact, there's some evidence to suggest the opposite in the misuse of wearing a mask properly or fitting it properly."

140.   Researchers at Oxford University's Centre for Evidence-Based Medicine have stated: "despite two decades of pandemic preparedness, there is considerable uncertainty as to the value of wearing masks." This is all very consistent with the position published in the New England Journal of Medicine, the

premier medical journey in the country: "We know that wearing a mask outside health care facilities offers little, if any, protection from infection."

141.   Finally, as previously alleged, scientific studies show that asymptomatic transmission is extremely rare.  Since SARS-CoV-2 particles are 0.06 to 0.125 microns in size, and masks and respirators filter particles 0.3 to 0.8 microns in size, masks cannot possibly work.  Thus mandating masking for the healthy in public spaces is not likely to have any significant impact on overall rates of community spread.

142.   At the same time, face masks cause a range of serious physical and psychological harm.  They have been shown to raise resting blood pressure in both pregnant and non-pregnant women. They have been shown to reduce oxygen intake and increase carbon dioxide intake.  The increased carbon dioxide levels caused by mask-wearing can lead to cognitive impairment.  Wearing a mask can result in dangerously low blood oxygen levels.  The federal Occupational Safety and Health Administration ("OSHA") requires that employees breathe air consisting of at least 19.5% oxygen, and masks have been shown to reduce oxygen content by at least 20%, so that mask-wearers are receiving air with at most 16.2% oxygen.  OSHA states:

> Human beings must breathe oxygen . . . to survive, and begin to suffer adverse health effects when the oxygen level of their breathing air drops below [19.5 percent oxygen]. Below 19.5 percent oxygen . . . , air is considered oxygen-deficient. At concentrations of 16 to 19.5 percent, workers engaged in any form of exertion can rapidly become symptomatic as their tissues fail to obtain the oxygen necessary to function properly ... Increased breathing rates, accelerated heartbeat, and impaired thinking or coordination occur more quickly in an oxygen-deficient environment. Even a momentary loss of coordination may be devastating to a worker if it occurs while the worker is performing a potentially dangerous activity, such as

climbing a ladder. Concentrations of 12 to 16 percent oxygen cause tachypnea (increased breathing rates), tachycardia (accelerated heartbeat), and impaired attention, thinking, and coordination ... even in people who are resting.  At oxygen levels of 10 to 14 percent, faulty judgment, intermittent respiration, and exhaustion can be expected even with minimal exertion.

Masks have been shown to induce headaches in over 80% of wearers.

143.    In July 2020, Stanford released a study concluding that masks do nothing whatever to prevent transmission of Covid-19 and are responsible for an extremely alarming list of physiological, psychological and physical harms.[68] The list is provided below in the form of a chart.

**Table 1**
Physiological and Psychological Effects of Wearing Facemask and Their Potential Health Consequences.

| Physiological Effects | Psychological Effect | Health Consequences |
| --- | --- | --- |
| • Hypoxemia<br>• Hypercapnia<br>• Shortness of breath<br>• Increase lactate concentration<br>• Decline in pH levels<br>• Acidosis<br>• Toxicity<br>• Inflammation<br>• Self-contamination<br>• Increase in stress hormones level (adrenaline, noradrenaline and cortisol)<br>• Increased muscle tension<br>• Immunosuppression | • Activation of "fight or flight" stress response<br>• Chronic stress condition<br>• Fear<br>• Mood disturbances<br>• Insomnia<br>• Fatigue<br>• Compromised cognitive performance | • Increased predisposition for viral and infection illnesses<br>• Headaches<br>• Anxiety<br>• Depression<br>• Hypertension<br>• Cardiovascular disease<br>• Cancer<br>• Diabetes<br>• Alzheimer disease<br>• Exacerbation of existing conditions and diseases<br>• Accelerated aging process<br>• Health deterioration<br>• Premature mortality |

144.    German researchers studied reports made by parents and physicians into an online registry, regarding the effects of masking on 25,930 children who wore a mask on average 270 minutes each day. 60% of reports complained of

---

[68] https://www.sciencedirect.com/science/article/pii/S0306987720333028

irritability, 53% of headache, 50% of difficulty concentrating, 44% of reluctance to go to school, 42% of malaise, 38% of impaired learning, 37% of drowsiness or fatigue, 29.7% of shortness of breath, 26.4% of dizziness and 17.9% of being unwilling to move or play. Face masks may have other negative psychological impacts, particularly for children. Columbia University Professor of Psychiatry Kathleen Pike has stated:

> Many young children burst into tears or recoil when someone wearing a mask approaches.... By putting on masks, we take away information that makes it especially difficult for children to recognize others and read emotional signs, which is unsettling and disconcerting. These issues may be especially true for children with autism spectrum disorder, including Asperger's syndrome, who tend to have particular difficulties reading non-verbal cues.

145.    Masks have a profoundly dehumanizing effect. Over 60% of interpersonal communication is conveyed via non-verbal behaviors. The mask hides non-verbal communication, distorts the structure of the face, and disguises identity.

146.    Masks increase the risk of contracting an infection.  The U.S. Surgeon General stated: "You can increase your risk of getting COVID-19 by wearing a mask if you are not a health care provider.  Folks who don't know how to wear them properly tend to touch their faces a lot and actually can increase the spread of coronavirus."  The United Kingdom's Deputy Chief Medical Officer stated: "For the average member of the public walking down a street, it is not a good idea.  In fact, you can actually trap the virus in the mask and start breathing it in."

### (3)    The Futility of Lockdowns

147.    In October 2020, WHO Special Envoy on COVID-19 Dr. David Nabarro stated: "We in the World Health Organization do not advocate lockdowns as the

primary means of control of this virus.  The only time we believe a lockdown is justified is to buy you time to reorganize, regroup, rebalance your resources, protect your health workers who are exhausted, but by and large, we'd rather not do it."

148.   In January 2021, Stanford University scientists published a peer reviewed study in a medical journal concluding that the mandatory stay-at-home orders and business closures imposed in 8 countries including the United States have "no clear significant beneficial effect" versus voluntary measures adopted by countries such as Sweden and South Korea.

149.   In November 2020, French researchers analyzed data collected from 160 countries over the first 8 months of the pandemic and concluded in a published study that "stringency of the measures settled to fight pandemia, including lockdown, did not appear to be linked with death rate."

150.   In July 2020, the peer-reviewed medical journal the Lancet published a study in which researchers collected data from 50 countries with the highest numbers of COVID-19 cases, and concluded that "government actions such as border closures, full lockdowns, and a high rate of COVID-19 testing were not associated with statistically significant reductions in the number of critical cases or overall mortality."

151.   In June 2020, researchers from Tel Aviv University published a study analyzing cell phone mobility data released by Apple, Inc. that found no statistical association between lockdown severity and the number of COVID-19 fatalities.  "We would have expected to see fewer COVID-19 fatalities in countries with a tighter lockdown, but the data reveals that this is not the case."

152.   In May 2020, Oxford University's Blavatnik School of Government published a study of the lockdown countermeasures deployed by 17 different European governments called "The Results of Europe's Lockdown Experiment Are In."  The study concluded that "there's little correlation between the severity of a nation's restrictions and whether it managed to curb excess fatalities."

**E.   The Defendants' COVID-19 Mandates Have Wrought More Harm than COVID-19 Itself Has Caused**

153.   The real emergency the public confronts is one caused by the Emergency Mandates themselves, not by COVID-19.  The State bombards the public with misleading case and death counts, and terrorizes the public with doomsday public health language and scenarios, but it has not similarly reported on data showing the economic and human costs inflicted by its Emergency Mandates.  There is no "unintended consequences" dashboard to balance the terrifying misinformation. In addition to immediate harm, the Emergency Mandates will have trailing long-term costs that cannot be quantified at this time.

**(1)   The Economic Crisis Caused by the Emergency Mandates**

154.   The Emergency Mandates have caused extreme unemployment, collapsed consumer spending and widespread permanent business closures in Kentucky.  As a measure of economic damage, the overall unemployment rate is a significant indicator.   Between January and April of 2020 alone, Employment declined 325,100. By October, only 67% of those jobs had been recovered. The

unemployment crisis in Kentucky has widened the racial employment gap, reduced families ability to pay for housing and reduced child-care options for parents.[69]

155.    "The COVID-19 pandemic has exacerbated the economic divide between urban and rural America that has been widening for the last three and a half decades. Numerous social, demographic, health, and economic trends paint a picture of widespread community distress across wide swaths of the country. These trends are especially intense in Kentucky, since about 41% of Kentucky's population live in somewhat or mostly rural counties, compared to about 14% nationally."[70]

156.    Kentucky hospitals are facing an unprecedented financial tsunami as the cancelation of elective and non-urgent procedures has forced them to lose 2.6 billion dollars in 2020.  The hospitals have operated at reduced capacity, and have been forced to lay off and furlough workers and close physical facilities, including the unused field hospitals built for Covid-19 patient overflow but never used. Thus the Emergency Mandates have damaged Kentucky's healthcare infrastructure far more than any threat posed by COVID-19.

### (2)    The Human Catastrophe Caused by the Emergency Mandates

157.    Kentucky is experiencing unprecedented housing insecurity. Kentuckians are falling behind on their rent payments, burning through their savings, and skipping bills in order to remain housed.  Many Kentucky households

---

[69]http://cber.uky.edu/sites/cber/files/publications/CBER%202021%20Kentucky%20Annual%20Economic%20Report.pdf
[70] Id.

report being unable to meet basic household expenses, and unprecedented numbers of households are behind in their rent and at risk of eviction.

158.    Unemployment takes a toll on the ability of individuals and families to sustain themselves, deprives them of dignity, and has been linked in peer reviewed studies to a 20-30% increase in suicides and mental health problems.  The negative emotions associated with joblessness and lockdown are known to trigger relapse and increased substance usage in substance abusers.

159.    Suicide and depression rates have increased dramatically – particularly in younger people. CDC Director Robert Redfield admitted: "But there has been another cost that we've seen, particularly in high schools. We're seeing, sadly, far greater suicides now than we are deaths from COVID. We're seeing far greater deaths from drug overdose that are above the excess that we had as background than we are seeing deaths from COVID."  A CDC study reported that depression in adults is four times higher than the previous year at 24.3% of people (compared to 6.5% in 2019), and the rate of suicidal ideation in adults has doubled compared to the previous year.  Psychological damage to children includes social isolation, inability to participate in athletics, instilling fear of people not wearing masks, and collapse of family relationships when children are not allowed to be close to grandparents and other relatives. These damages will be seen for at least a generation.  Calls to suicide prevention hotlines have seen increases since March of 202, and anti-depressant and anxiety medications have spiked on college campuses.

160.    Kentucky is experiencing unprecedented numbers of drug overdoses. Drug overdoses went up by 50 percent in 2020. Only two states had a greater spike in drug overdoses during the pandemic.[71]

161.    Kentuckians have experienced unprecedented pressure on their mental and emotional health.

162.    Over 200,000 more Kentuckians are currently experiencing food insecurity than were doing so before the pandemic.[72]

163.    Substantial evidence is accumulating that patients are avoiding treatments that could prevent more severe conditions. This has resulted and will continue to result in excess deaths because people fear getting the treatment they need.  The CDC  estimates 93,814  non-COVID  "excess  deaths"  in  2020  alone, nationally, including 42,427 from cardiovascular conditions, 10,686 from diabetes, and 3,646 from cancer, and many of these are caused by the cancellation of "non-essential" care in response to COVID-19. The Journal of the American Medical Association reported that the weekly number of newly diagnosed cancer patients has dropped by 46.4% nationally, for 6 major cancers for which early detection is paramount (including breast, colorectal and esophageal), since March 2020.  Even a 4-week delay in treatment is associated with increased mortality.  Cancer is already the second leading cause of death in Kentucky.

164.    Parts of Kentucky are experiencing heightened school truancy, which superintendents attribute to difficulty with remote learning, lack of Internet access,

---

[71] https://www.nkytribune.com/2021/04/ky-had-third-highest-percentage-rise-in-overdose-deaths-in-2020-spike-followed-start-of-pandemic/
[72] Id.

lack of technology and fear of sickness. Many Kentucky students and educators report not having Internet access at home. Many others report inadequate broadband for hosting conferences online.  The home environment is not optimal for learning in other cases. Kentucky educators fear the "COVID-19 slide" – the loss of learning that occurs remotely. National data from McKinsey suggests that on average students lost 3 months of learning in math, and 1.5 months of learning in reading. COVID-19 quarantines have depleted Kentucky school staffs, forcing even more remote learning. The Emergency Mandates have cut special needs children off from the in-person one-on-one learning, occupational therapy, physical therapy and other specialist intervention they need in order to thrive and have forced their often untrained parents to assume primary responsibility for their education.

165.    In January 2021, the U.S. National Bureau of Economic Research estimated that the unemployment caused by COVID-19 mandates will cause 890,000 excess deaths in the United States over the next 15 years.

## VI.  COUNTS

### COUNT I
### DECLARATORY JUDGMENT
### Cessation of Emergency

166.    Plaintiffs adopt all of the preceding paragraphs and incorporate them by reference, as if fully set forth herein.

167.    In Home Building and Loan Association v. Blaisdell, 290 U.S. 398 (1934), the U.S. Supreme Court stated: "Whether an emergency exists upon which the continued operation of the law depends is always open to judicial inquiry."  290 U.S. at 442, citing Chastleton Corp. v. Sinclair, 264 U.S. 543 (1924).

168.    In <u>Sinclair</u>, the Supreme Court stated: "A law depending upon the existence of emergency or other certain state of facts to uphold it may cease to operate if the emergency ceases or the facts change."  264 U.S. at 547.

169.    Both <u>Blaisdell</u> and <u>Sinclair</u> are clear authority that an emergency and the rules promulgated thereunder must end when the facts of the situation no longer support the continuation of the emergency.

170.    They also forbid this Court to merely assume the existence of a "public health crisis" based on the pronouncements of the Defendants.  They are clear authority that it is the duty of the court of first instance to grapple with this question and conduct an inquiry.   "[A] Court is not at liberty to shut its eyes to an obvious mistake when the validity of the law depends upon the truth of what of what is declared."  Id.  The <u>Sinclair</u> court instructed lower court's to inquire into the factual predicate underlying a declaration of emergency, where there appears to have been a change of circumstances: "the facts should be gathered and weighed by the court of first instance and the evidence preserved for consideration by this Court if necessary."  264 U.S. at 549.

171.    The Defendants' own data, the data produced by the federal CDC and the availability of multiple COVID-19 vaccines demonstrate an undeniable change in circumstances, and that the exigencies underlying the Emergency no longer exist, if they ever did. Plaintiffs have accumulated and will present expert medical and scientific evidence further supporting this contention. If the exigencies no longer exist, then the Emergency and the Emergency Mandates must end. Plaintiffs

therefore seek a Declaratory Judgment terminating both the Emergency Mandates and the underlying Emergency upon which they depend.

172.    Plaintiffs therefore seek a Declaratory Judgment that the exigencies underlying the Emergency no longer exist, if they ever did; that the Emergency has ended; and that in the absence of a public health emergency, the Defendants lack any reason to continue to infringe on the civil liberties of the citizens of Kentucky, thereby nullifying all Emergency Mandates.

## COUNT II
## DECLARATORY JUDGMENT
### Separation of Powers
### (Kentucky Constitution)

173.    Plaintiffs adopt all of the preceding paragraphs and incorporate them by reference, as if fully set forth herein.

174.    Sections 27 and 28 of the Kentucky Constitution Bill of Rights summarize the separation-of-powers principle in Kentucky as follows:

**DISTRIBUTION OF THE POWERS OF GOVERNMENT**

**Section 27. Powers of government divided among legislative, executive, and judicial departments.**

The powers of the government of the Commonwealth of Kentucky shall be divided into three distinct departments, and each of them be confined to a separate body of magistracy, to wit: Those which are legislative, to one; those which are executive, to another; and those which are judicial, to another.

**Section 28. One department not to exercise power belonging to another.**

No person or collection of persons, being of one of those departments, shall exercise any power properly belonging to

either of the others, except in the instances hereinafter
expressly directed or permitted.

175.   As a threshold matter, no provision of the Kentucky Constitution can
be said to have "expressly directed or permitted" the Defendants to exercise, as they
have for an entire year, the sweeping legislative OR Executive powers represented
by the comprehensive, detailed, and substantive Emergency Mandates.

176.   On the contrary, when forming their Constitution, the people of
Kentucky expressly reserved to themselves by way of a General Assembly, and not
to the Executive, the power to legislate directly.

177.   Section 29 of the Bill of Rights of the Kentucky Constitution states:

> **Section 29. Legislative power vested in General Assembly**.
> The legislative power shall be vested in a House of
> Representatives and a Senate, which, together, shall be styled
> the General Assembly of the Commonwealth of Kentucky.

178.   It was the General assembly who originally authorized the Emergency
Authority by which the Mandates, including every Executive Emergency Order, has
been handed down.

179.   There are only two ways the Executive Branch receives authority to
act in Kentucky. The Executive may act upon that authority which the Constitution
enumerates; and the Executive may exercise whatever authority is granted to it by
the Legislative Branch.

180.   Whatever authority is granted to the Executive by the Legislature may
be revoked by the same.

181.   The Emergency Authority that Governor Beshear and the other
Defendants have used as a cudgel to bruise and maim the Commonwealth these last

13 months, in the name of an emergency that no longer exists, has been constitutionally and irrevocably withdrawn by Kentucky's Legislature.[73] In revoking the emergency authority previously granted, the Legislative Branch fully complied with the Constitution's procedural requirements for enacting laws.

182.    Governor Beshear refused to accept the will of the Legislature, and in an attempt to substitute his will for that of the Legislature, he sued for an injunction to prevent the Law from being enforced. To bolster this clear violation of the separation of powers, Governor Beshear presented a lengthy Complaint to the Courts that was rife with misinformation. He essentially argued that the alleged pandemic was simply too scary for the Constitution of Kentucky and the Separation of Powers to have actual meaning in the face of such terrifying danger.

183.    Despite the fact that the legislation revoking the Emergency Power that Governor Beshear has wielded so abusively and for so long had already vanished by operation of law; and despite the fact that Governor Beshear is both honor and duty bound to faithfully execute the laws of the Commonwealth of Kentucky… Nevertheless, Governor Beshear sought to enjoin the law. Curiously, he received a temporary injunction and a lower Court allowed him to carry on with the Authority that is no longer his.

184.    Notwithstanding this recent and most unusual turn of events, where the Executive and Judicial branches joined to unlawfully restrain the Legislative branch in the execution of its Constitutional duty, Governor Beshear has acted in a

---

[73] *See* the Timeline above.

manner calculated to work around the Legislature and therefore thwart the will of the Citizens of the Commonwealth.

185.    Wielding Executive Authority in the name of an Emergency that does not exist, using data that is false and that he knows or ought to know is untrue, is to wield executive authority that does not exist. Governor Beshear has wielded this non-existent authority for too long. An emergency, by its very definition, is not an ongoing state of affairs. An emergency arrives and it departs, leaving work to do in its aftermath.

186.    A flood may be an emergency. Hurricanes and tornadoes may be emergencies. An earthquake may be an emergency. The seasonal flu is not an emergency, and neither is the variant we face with Covid-19. The plague that has infected Kentucky and left it sick and struggling as a Commonwealth is not Covid. The plague that has sickened and distressed Kentucky are the abusive and arbitrary emergency mandates.

187.    Plaintiffs therefore seek a Declaratory Judgment that the KRS provisions specifically relied upon by the State in promulgating its endless Emergency Mandates, are an unconstitutional delegation of legislative power.

## COUNT III
## DECLARATORY JUDGMENT
**Constitutional Right to Free Exercise of Religion, Right of Association, Equal Protection**

**(U.S. Constitution, Kentucky Constitution)**

188.    Plaintiffs adopt all of the preceding paragraphs and incorporate them by reference, as if fully set forth herein.

189.   The religion clauses in the 1st Amendment of the U.S. Constitution say: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. CONST., amend. I.

190.   Closely related to free exercise, the courts have recognized a freedom of expressive association. "[W]e have long understood as implicit in the right to engage in activities protected by the First Amendment a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, *religious*, and cultural ends." Roberts v. United States Jaycees, 468 U.S. 609, 622 (1984).

191.   "Government is not free to disregard the First Amendment in times of crisis. ***At a minimum***, that Amendment prohibits government officials from treating religious exercises worse than comparable secular activities, unless they are pursuing a compelling interest and using the least restrictive means possible." Roman Catholic Diocese v. Cuomo, 141 S.Ct. 63, 69 (2020) (emphasis added).

192.   Further, Section 1 Part 2 of the Bill of Rights of the Kentucky Constitution states.

> **Rights of life, liberty, worship, pursuit of safety and happiness, free speech, acquiring and protecting property, peaceable assembly, redress of grievances, bearing arms. All men are, by nature, free and equal, and have certain inherent and inalienable rights, among which may be reckoned**:

> **Second**: The right of worshipping Almighty God according to the dictates of their consciences.

193.   As a direct and proximate result of the Emergency Mandates, Plaintiffs Larry Nichols, Joshua Nichols, Wesley Anglin, Frank Anglin, Maggie Anglin, Robin

Harboldt and her minor child P, and Charles W. Burton have been burdened in the free exercise of their faith, and related rights of association.

194.    Plaintiffs therefore seek a Declaratory Judgment that the Defendants have violated their fundamental 1st Amendment right to the free exercise of religion and related freedom of association, deprived them of the equal protection of the laws under the Equal Protection Clause of the 14th Amendment, and violated the Kentucky Constitution.

## COUNT IV

### DECLARATORY JUDGMENT

**Constitutional Right to Political Speech and Peaceable Assembly,
Right of Association, Equal Protection**

**(U.S. Constitution)**

195.    Plaintiffs adopt all of the preceding paragraphs and incorporate them by reference, as if fully set forth herein.

196.    The 1st Amendment to the U.S. Constitution states: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people to peaceably assemble, and to petition the government for a redress of grievances." U.S. CONST., amend. I.

197.    "The right of free and peaceable assembly for lawful purpose and in a manner without governmental interference or hindrance is a fundamental right, of the very essence of democracy, and is guaranteed under the First Amendment." C.J.S., Constitutional Law § 134.   It is a crucial legal protection for even something as

simple as assembling with other parents to watch your children engage in sporting competition..

198.    Plaintiff Matt Schweder and P, therefore seek a Declaratory Judgment that the Defendants have violated their First Amendment rights to peaceable assembly and related freedom of association, and deprived them of the equal protection of the laws under the Equal Protection Clause of the 14th Amendment.

199.    Plaintiffs Larry Nichols, Joshua Nichols, Wesley Anglin, Frank Anglin, Maggie Anglin, Robin Harboldt and her minor child P, and Charles W. Burton therefore also seek a Declaratory Judgment that the Defendants have violated their First Amendment rights to peaceable assembly and related freedom of association, and deprived them of the equal protection of the laws under the Equal Protection Clause of the 14th Amendment.

## COUNT V
## DECLARATORY JUDGMENT
### Substantive Due Process

### (U.S. Constitution)

200.    Plaintiffs adopt all of the preceding paragraphs and incorporate them by reference, as if fully set forth herein.

201.    In Planned Parenthood v. Casey, 505 U.S. 833, 857, the U.S. Supreme Court stated:

> Roe, however, may be seen not only as an exemplar of Griswold liberty, but as a rule (whether or not mistaken) of personal autonomy and bodily integrity, with doctrinal affinity to cases recognizing limits on governmental power to mandate medical treatment or to bar its rejection.  If so, our cases since Roe accord with Roe's view that a State's interest in the protection of life falls short of justifying any plenary override of individual liberty claims. Cruzan v. Director, Mo.

Dept. of Health, 497 U.S. 261, 278, 111 L. Ed. 2d 224, 110 S. Ct. 2841 (1990); cf., e. g., Riggins v. Nevada, 504 U.S. 127, 135, 118 L. Ed. 2d 479, 112 S. Ct. 1810 (1992); Washington v. Harper, 494 U.S. 210, 108 L. Ed. 2d 178, 110 S. Ct. 1028 (1990); see also, e. g., Rochin v. California, 342 U.S. 165, 96 L. Ed. 183, 72 S. Ct. 205 (1952); Jacobson v. Massachusetts, 197 U.S. 11, 24-30, 49 L. Ed. 643, 25 S. Ct. 358 (1905).

To reiterate: "**a State's interest in the protection of life falls short of justifying any plenary override of individual liberty claims**."  (emphasis added).

202.    If a state's interest in the protection of life falls so short of being able to override individual liberty interests that it may not be used to prevent the killing of an unborn child, how then can the State argue that it may forgo those interests in an attempt to force ineffective and unproven methods of preventing and/or treating COVID-19, *a disease that has a 99.875% overall recovery rate*?   It cannot.

Right to Personal Autonomy and Bodily Integrity

203.    The Supreme Court has stated that the protected liberty claims inherent in personal autonomy and bodily integrity include both the right *to be free from* unwanted medical intervention, and the right *to obtain* medical intervention:

> As the joint opinion acknowledges, *ante*, 505 U.S. at 857, this Court has recognized the vital liberty interest of persons in refusing unwanted medical treatment. Cruzan v. Director, Mo. Dept. of Health, 497 U.S. 261, 111 L. Ed. 2d 224, 110 S. Ct. 2841 (1990). Just as the Due Process Clause protects the deeply personal decision of the individual to *refuse* medical treatment, it also must protect the deeply personal decision to *obtain* medical treatment, including a woman's decision to terminate a pregnancy. (Id. at 927).

204.    The Emergency Mandates have forced all Plaintiffs to wear face masks against their will, and subject to criminal prosecution. Face masks are a medical device. The FDA states: "The FDA regulates face masks, including cloth face coverings, and surgical masks as medical devices when they are marketed for

medical purposes. Medical purposes include uses related to COVID-19, such as face masks to help stop the spread of disease…"  Face masks cause psychological harm to children. They reduce blood oxygen levels to dangerously low levels, and can cause tooth decay. There is no scientifically reliable evidence that they are effective in stopping the transmission of SARS-CoV-2. The constant elastic pressure can cause jaw problems over time, a condition that some within the medical community refer to as "mask mouth."

205.    The Emergency Mandates have blocked Plaintiff Kenneth L. Kearns, II from receiving the 15th of 15 cancer related surgeries. They have prevented him from receiving the medical treatment that he needs.  They have cut off his access to the occupational and physical therapy that he needs.  They have forced him to suffer unnecessarily, and to regress profoundly, without medical care. This is not merely a burden. It is inhumane.

Right to Work

206.    The 14th Amendment guarantees a citizen's right to work for a living and support herself by pursuing a chosen occupation.  Board of Regents v. Roth, 408 U.S. 564, 572 (1972); Truax v. Raich, 239 U.S. 33, 41 (1915) ("It requires no argument to show that the right to work for a living in the common occupations of the community is of the very essence of the personal freedom and opportunity that it was the purpose of the [14th] Amendment to secure.").

207.    Without the right to work in a profession of their own choosing, rather than being directed into a profession by the State, or directed not to work and placed on subsidies by the State, we are slaves. The Emergency Mandates have

deprived Plaintiffs Larry Nichols, Joshua Nichols, Wesley Anglin, Frank Anglin, Maggie Anglin, Robin, and Charles W. Burton from engaging in their chosen profession as full or part time chaplains, and from doing the work that they find most meaningful.

Freedom of Movement

208.   Separate and apart from the right of travel, there is a fundamental right to move about freely in the public. City of Chicago v. Morales, 527 U.S. 41, 53-54, 119 S. Ct. 1849, 144 L. Ed. 2d 67 (1999) (striking down an antiloitering ordinance aimed at combatting street gangs and observing that "the freedom to loiter for innocent purposes is part of the 'liberty' protected by the Due Process Clause of the Fourteenth Amendment."); Papachristou v. Jacksonville, 405 U.S. 156, 164-65, 92 S. Ct. 839, 31 L. Ed. 2d 110 (1972) (citing a Walt Whitman poem in extolling the fundamental right to loiter, wander, walk or saunter about the community); Bykofsky v. Middletown, 429 U.S. 964, 97 S. Ct. 394, 50 L. Ed. 2d 333 (1976) (Marshall, J., dissenting) ("The freedom to leave one's house and move about at will is of the very essence of a scheme of ordered liberty, . . . and hence is protected against state intrusions by the Due Process Clause of the Fourteenth Amendment.") (internal citation and quotation marks omitted)); Waters v. Barry, 711 F. Supp. 1125, 1134 (D.D.C. 1989) (referencing Papachristou and stating "[t]he right to walk the streets, or to meet publicly with one's friends for a noble purpose or for no purpose at all—and to do so whenever one pleases—is an integral component of life in a free and ordered society.").

209.    Plaintiff Matt Schweder and Kenneth Kearns have both been burdened in their right to move about freely. Matt has been restricted from traveling to the very place he would most like to be during his daughter's soccer matches, and by creating a situation where Ken has regressed so drastically, he has become unable to go out and must remain sequestered at home for his own health. But for the Mandates and his surgery having been deemed non-essential elective surgery, Ken would be healed or healing, and free to move about as he pleases.

210.    The Plaintiffs have all been likewise burdened in their right to move about freely.

Education

211.    The U.S. Supreme Court has held that "the denial of education to some isolated group of children poses an affront to one of the goals of the Equal Protection Clause: the abolition of governmental barriers presenting unreasonable obstacles to advancement on the basis of individual merit."  Plyler v. Doe, 457 U.S. 202, 221-222 (1982).  Plyler involved undocumented aliens, who are not a suspect class.  Id.  If the state cannot deny undocumented aliens an education, it cannot deny these Plaintiffs the right to both give and receive an education.

212.    Plaintiffs therefore seek a Declaratory Judgment that the Defendants have violated their constitutional rights to personal autonomy and bodily integrity, work, freedom of movement and education, under the Substantive Due Process Clause of the 14th Amendment.

## COUNT VI

**DAMAGES**

**(42 U.S.C. § 1983)**

1.      Plaintiffs adopt all of the preceding paragraphs and incorporate them by reference as if fully set forth herein.

2.      Civil money damages are available under 42 U.S.C. § 1983 where plaintiffs can show a clear constitutional violation, and have sued government employees in their personal capacities.  Tanzin v. Tanvir, 141 S.Ct. 486, 490 (2020) ("[42 U.S.C. § 1983 applies to 'person[s] acting under color of any statute' and this Court has long interpreted it to permit suits against officials in their individual capacities.").

3.      Defendants, under color of the Emergency Mandates, have injured Plaintiffs by depriving them of clearly established constitutional rights, privileges and immunities of which a reasonable person would have known, in all of the ways alleged in this Complaint.

4.      Defendants, under color of the Emergency Mandates, have physically, mentally, and emotionally injured Plaintiffs in the process of depriving them of their clearly established constitutional rights, privileges and immunities of which a reasonable person would have known, in all of the ways alleged in this Complaint.

### VII.  PRAYER FOR RELIEF

WHERFORE, and for the foregoing reasons, Plaintiffs request that this Court:

(A)      Declare that the exigencies underlying Governor Beshear's initial emergency declaration no longer exist, if they ever did; and in the absence of a public health emergency, the state lacks any reason to continue to infringe on the rights of the citizens of the Commonwealth

of Kentucky, thereby nullifying the Emergency and the Emergency Mandates;

(B)     Declare that Governor Beshears Executive Order establishing an Emergency when one did not exist, as well as his repeated and unending renewals of the unilateral declaration of a pre-emptive state of emergency violates the Separation of Powers required by the Kentucky Constitution, thereby nullifying the Emergency and the Emergency Mandates;

(D)     Declare that the Emergency Mandates violate the constitutional right to free exercise of religion of Tom Kelly and the Chaplains of KY JAIL MINISTRIES, INC, as well as the entity itself, Larry Nichols, Joshua Nichols, Wesley Anglin, Frank Anglin, Maggie Anglin, Robin and her minor child P, and Charles W. Burton, and their right to the equal protection of the laws; and that Matt Schweder and P Schweder's right to the equal protection of the laws have also been so violated.

(E)     Declare that the Emergency Mandates violate the constitutional right to peaceable assembly of Plaintiff Matt Schweder and P, along with the other Plaintiffs, and to their rights to the equal protection of the laws.

(G)     Declare that the Emergency Mandates violate the constitutional right of all Plaintiffs to personal autonomy and bodily integrity, lawful occupation, freedom of movement and public education.

(H)     Enjoin the enforcement of the unconstitutional aspects of the challenged Emergency Mandates;

(I)     Enjoin the use of PCR test results as the basis for determining public health responses and restrictions unless and until it is proven by the Defendants that this test is reliable and accurate at the cycle thresholds being used in Kentucky;

(J)     Award to each of the Plaintiffs, under 42 U.S.C. § 1983, compensatory damages, including both economic and non-economic damages together with punitive damages where available and appropriate, against the Defendants; and

(K)     Award Plaintiffs such other and additional relief as the Court deems fit.

## VIII.  JURY DEMAND

Plaintiffs request a jury trial on all issues so triable, including without limitation the quantum of damages.

Dated: APRIL 27, 2021.
Respectfully submitted,

| Thomas Renz, Esq. (Ohio Bar No. 98645) | By:      _/s/  Michael A. Hamilton_ |
|---|---|
| RENZ LAW, LLC | Michael A. Hamilton, Esq. |
| 1907 W. State Street, Suite 162 | (KY Bar No. 89471) |
| Fremont, OH 43420 | HAMILTON & ASSOCIATES |
| Tel. 419-351-4248 | 1067 N. Main St, PMB 224 |
| _Attorneys for Plaintiffs_ | Nicholasville, KY 40356 |
| _(Admission Pending Pro Hac Vice)_ | Tel. 859-655-5455 |
| | _Attorneys for Plaintiffs_ |